EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ángel E. Feliciano Aguayo<br><br>Peticionario<br><br>v.<br><br>Mapfre Panamerican Insurance Company<br><br>Recurrido | 2021 TSPR 73<br><br>207 DPR ____ |

Número del Caso: AC-2020-50

Fecha: 28 de mayo de 2021

Tribunal de Apelaciones:

    Panel X

Abogados de la parte peticionaria:

    Lcdo. Juan H. Saavedra Castro
    Lcdo. Luis M. Correa Márquez
    Lcda. Claudia A. Rosa Ramos
    Lcda. María D. Irizarry Marqués

Abogada de la parte recurrida:

    Lcda. Amanda L. Hernández Fernández

Materia: Obligaciones y contratos/Derecho de seguros - A la hora de evaluar si procede aplicar la figura del pago en finiquito, los tribunales tienen que considerar cada uno de los requisitos que las leyes aplicables y la jurisprudencia interpretativa ha establecido.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel E. Feliciano Aguayo

    Peticionario

        v.

                       AC-2020-50

Mapfre Panamerican Insurance
Company

    Recurrido

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico a 28 de mayo de 2021.

Al resolver la controversia ante nuestra consideración evaluamos cómo opera la figura del pago en finiquito ("*accord and satisfaction*") en el campo de seguros con las regulaciones particulares de esta industria. Además, la justipreciamos en el contexto de la relación entre aseguradora y asegurado. Por último, y por tratarse de un pago mediante un instrumento negociable (un cheque), precisamos su análisis en el contexto de lo estatuido en la *Ley de Transacciones Comerciales*.

Así, al evaluar los hechos de este caso en el contexto del derecho aplicable, resolvemos que no procedía dictar sentencia sumaria.

I

A raíz del paso del Huracán María, el Sr. Ángel E. Feliciano Aguayo (asegurado) sufrió pérdidas en su propiedad. Al 20 de septiembre de 2017, fecha del paso del evento atmosférico, el inmueble estaba asegurado contra el peligro de huracán bajo una póliza expedida por MAPFRE Panamerican Insurance Company (aseguradora). La póliza aseguraba la vivienda hasta el límite de $140,165 con un deducible de $2,803 y el límite de $15,000 en propiedad personal o contenido con un deducible de $500.

Así las cosas, el asegurado realizó su aviso de pérdida a la aseguradora. En respuesta, y luego de realizar la inspección, de concluida la investigación y el ajuste de la reclamación, la aseguradora remitió al asegurado dos cartas. La primera, estaba relacionada a la cubierta de propiedad personal o contenido. En específico, en esta carta la aseguradora comunicó al asegurado que como la suma total de los daños sufridos era menor al deducible establecido en la póliza no procedía pago alguno y que, en consecuencia, procederían con el cierre de la reclamación sin trámite adicional.

En la otra carta, concerniente a la cubierta de vivienda, la aseguradora manifestó lo siguiente:

> Estimado Asegurado:
>
> Por este medio se le notifica que hemos concluido con el proceso de investigación y ajuste de la reclamación de referencia. Adjunto encontrará un estimado de los daños que identificó MAPFRE fueron ocasionados a su propiedad a consecuencia del huracán. Conforme a ello, MAPFRE concluyó que los daños sufridos por su propiedad ascienden a $3,681.00. Luego de ajustar su reclamación y de aplicar el

deducible correspondiente se incluye el cheque #1819947 emitido por MAPFRE a su favor y a favor de BANCO POPULAR DE PR (OFICINA CENTRAL) por la cantidad de $3,878.00.[1]

Con el pago de la cantidad antes indicada, se resuelve su reclamación y por ende se está procediendo a cerrar la misma.

De usted entender que existen daños adicionales a los identificados por MAPFRE en el documento adjunto, o no estar de acuerdo con el ajuste, conforme establece la ley usted tiene derecho a solicitar una reconsideración del ajuste efectuado.

Su solicitud de reconsideración deberá ser por escrito, estableciendo los motivos por los cuales se debe reconsiderar nuestra decisión y de existir daños adicionales presentar evidencia documental y/o fotográfica de los mismos. Dicha solicitud de reconsideración deberá ser dirigida a la siguiente dirección:

MAPFRE
Dpto. de Reclamaciones de Propiedad
P.O. Box 70333
San Juan, Puerto Rico 00936-8333
anortiz@mapfrepr.com

De tener usted alguna duda, puede comunicarse con nosotros a su conveniencia.

Cordialmente,

(Fda.)
ANIBAL ORTIZ RIVERA
Departamento de Reclamaciones
MAPFRE PUERTO RICO

Además, la aseguradora anejó un cheque por $3,878 cuyo anverso indicaba que era en pago total y final de la reclamación por el Huracán María.

Posteriormente, el asegurado presentó una *Demanda* contra la aseguradora por incumplimiento de contrato y daños contractuales. En resumen, alegó que la aseguradora incumplió con los términos y condiciones de su póliza de seguros, al negarse a indemnizarle acorde con lo establecido en el contrato. Explicó que el ajustador no cumplió con los

---

[1] Los daños identificados por la aseguradora menos el deducible ($3,681-$2,803) totalizan $878. Sin embargo, a esta cantidad la aseguradora le aplicó el endoso de daños por inundación de $3,000. Así, la cantidad a pagar identificada en el cheque corresponde a $3,878. *Apéndice de la Apelación*, pág. 74.

términos de la póliza y que omitió y subestimó las pérdidas cubiertas de daños por tormenta de viento causados por el Huracán María. Arguyó que la aseguradora había actuado de forma dolosa y de mala fe al negarse a pagar la reclamación. También, alegó que la aseguradora incurrió en prácticas desleales en el ajuste de las reclamaciones. Así, reclamó **$154,017.23** en concepto de daños a la vivienda. Además, solicitó que se dictara sentencia a su favor en lo relativo a la cubierta de bienes personales, según fuera probado en el juicio.

Mediante moción, el 8 de mayo de 2019 la aseguradora solicitó la desestimación de la demanda o que se dictara sentencia sumaria a su favor. En resumen, argumentó que conforme a la doctrina de pago en finiquito procedía la desestimación de la reclamación, puesto que el asegurado recibió un cheque por **$3,878.00** junto con la carta de cierre de la reclamación. Asimismo, adujo que el cheque indicaba que era en pago total y final de la reclamación. Finalmente, arguyó que el peticionario sin objeción, condición o reserva alguna recibió, aceptó y cambió el cheque.

El asegurado se opuso a la moción dispositiva y argumentó sobre la inaplicabilidad de la doctrina de pago en finiquito en este caso. En resumen, argumentó que la figura del pago en finiquito no aplicaba cuando su uso pretendía soslayar violaciones al Código de Seguros y cuando había ausencia de buena fe estatutaria. También adujo que el Código de Seguros imponía una obligación a la aseguradora más amplia

que el mero envío de un cheque con una hoja de trabajo sin un informe de la investigación, las razones para las cantidades del ajuste y los derechos que le asisten al asegurado de forma tal que su consentimiento a un pago minúsculo por los daños causados en el desastre sea de carácter informado. Por último, añadió que tampoco procedía la doctrina cuando se trataba de sumas líquidas y exigibles.

Así las cosas, el 10 de septiembre de 2019, el Tribunal de Primera Instancia dictó *Sentencia Sumaria* y desestimó la demanda. El foro de instancia concluyó que el cheque advertía que era en pago total y que, consecuentemente, "[a]l haber endosado el cheque, [el asegurado] está impedido de presentar una reclamación contra [la aseguradora], a tenor con la doctrina de pago en finiquito".[2]

En desacuerdo, el asegurado presentó un recurso de apelación ante el Tribunal de Apelaciones. En particular, señaló que el foro de instancia erró al determinar que se configuraron los elementos de la doctrina de pago en finiquito y al desestimar sumariamente la demanda. Atendido el recurso, el foro apelativo intermedio confirmó la sentencia apelada. En resumen, concluyó que al configurarse todos los elementos del pago en finiquito procedía dictar sentencia sumaria.[3]

Inconforme, el asegurado acudió a este Tribunal y señaló que los foros *a quo* erraron al concluir que se habían

---

[2] *Apéndice de la Apelación,* pág. 243.

[3] Adviértase que la Jueza Grace M. Grana Martínez disintió.

configurado todos los elementos de la figura del pago en finiquito y al determinar que no existían hechos en controversia.

Luego de acoger el recurso como *certiorari*, expedir el mismo y habiéndose expresado las partes, estamos en posición de resolver la controversia ante nuestra consideración. Siendo así, veamos el derecho aplicable.

II

**A. El contrato de seguros**

El Código de Seguros de Puerto Rico regula, entre otros aspectos de la industria, y de la entidad reguladora, el contrato de seguros. En específico, este cuerpo de normas define el seguro como "el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo".[4] Consecuentemente, en este tipo de contrato el asegurador asume determinados riesgos a cambio del cobro de una prima o cuota, en virtud de la cual se obliga a responder por la carga económica que recaiga sobre el asegurado, en el caso de que ocurra algún evento especificado en el contrato.[5] Así, vemos que el contrato de seguro tiene el propósito de indemnizar y proteger al asegurado en caso de producirse el

---

[4] Cód. Seg. PR art.1.020, 26 LPRA § 102.

[5] ECP Incorporated v. OCSECP, 2020 TSPR 112, 205 DPR __ (2020); Savary *et al.* v. Mun. Fajardo *et al.*, 198 DPR 1014, 1023 (2017); S.L.G. Francis Acevedo v. SIMED, 176 DPR 372, 384 (2009).

suceso incierto previsto.[6] Esto es, los contratos de seguros tienen como característica esencial la obligación de indemnizar.[7] A su vez, los contratos de seguros son de extrema buena fe. Esto es, se requiere un extremo grado de buena fe en las negociaciones precedentes a la perfección o consumación del contrato.[8] Esto, en armonía con que la buena fe es un precepto general de toda actividad jurídica y como tal se extiende a la totalidad de nuestro ordenamiento.[9]

A tenor con lo anterior, recientemente reiteramos el alto interés público con el que está investido el negocio de seguros en Puerto Rico.[10] Esto, "debido al papel que juega en la protección de los riesgos que amenazan la vida o el patrimonio de los ciudadanos".[11] Así, "[h]emos destacado, en innumerables ocasiones, que este alto interés público se desprende de la extraordinaria importancia que juegan los seguros en la estabilidad de nuestra sociedad". [12] En particular, los seguros cumplen una función social.[13] Además, "[s]u utilidad dentro del comercio es trascendental

---

[6] *Véanse*, 26 LPRA § 1125; *R. J.* Reynolds v. Vega Otero, 197 DPR 699,707 (2017) (*citando a* Integrand Assurance v. CODECO *et al.*, 185 DPR 146, 162 (2012); Echandi Otero v. Stewart Title, 174 DPR 355, 370 (2008)).

[7] OCS v. CODEPOLA, Inc., 202 DPR 842, 859 (2019).

[8] *Véase*, R. Cruz, *Derecho de Seguros*, San Juan, Pubs. JTS, 1999, Sec. 20.3, pág. 14.

[9] Velilla v. Pueblo Supermarkets, Inc., 111 DPR 585, 587-588 (1981).

[10] Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1019 (2020).

[11] R.J. Reynolds v. Vega Otero, 197 DPR 699, 706 (2017) (*citando a* Natal Cruz v. Santiago Negrón *et al.*, 188 DPR 564, 575 (2013)).

[12] *Íd. Véase, además*, S.L.G. Francis-Acevedo v. SIMED, 176 DPR 372, 384 (2009).

[13] *R.J. Reynolds*, 197 DPR en la pág. 706.

para el desarrollo económico pues atenúa el elemento inherente del riesgo en las relaciones comerciales".[14]

Según expresado por este Tribunal, el contrato de seguro "juega un papel económico crucial, tanto a nivel individual como en el ámbito comercial, ya que permite igualmente a las personas, como a los negocios, proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima".[15] Ante esta realidad, el negocio de seguros se convierte en uno de los principales soportes que permite atenuar los giros violentos de incertidumbre propios del mercado, aminorar sus efectos y permitir un crecimiento más estable de la economía.[16]

De manera que, las compañías aseguradoras constituyen la institución por excelencia cuyo propósito es proteger las necesidades y consecuencias dañosas de los riesgos que amenazan al hombre en su vida o patrimonio.[17] En consecuencia, el arraigo de alto interés público del que está revestido el negocio de los seguros se desprende de la extraordinaria importancia y el papel evidentemente social del que participa.[18] Por esta razón, el Estado lo ha regulado ampliamente, en principio, mediante el Código de Seguros de Puerto Rico y, de manera supletoria, con las disposiciones

---

[14] *Íd.*, pág. 707.

[15] Maderas Tratadas v. Sun Alliance *et al.*, 185 DPR 880, 897 (2012).

[16] *R.J. Reynolds,* 197 DPR en la pág. 707.

[17] *S.L.G. Francis-Acevedo*, 176 DPR en la pág. 384.

[18] *Íd.*

del Código Civil.[19] Nótese que el gobierno goza de amplia facultad en escoger el método para reglamentar y supervisar la industria de seguros, esto a fin de proteger el interés público.[20] El reconocer la importancia que revisten los seguros en el entorno social y mercantil, ha impulsado que el Estado implemente reglamentación extensa.[21]

De otra parte y en cuanto a la interpretación del contrato de seguros se refiere, el propio Código de Seguros establece como norma de hermenéutica que "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta".[22] Hemos resuelto que el contrato de seguros es uno de adhesión, pues el asegurador es quien redacta en su totalidad.[23]

Por otro lado, es sabido que cuando se produce el suceso incierto previsto en el contrato de seguros suelen suscitarse controversias.[24] Ante esta realidad, al momento de interpretar las cláusulas, términos y condiciones, hay que tener presente que los contratos de seguro -al igual que

---

[19] *R.J. Reynolds.*

[20] *OCS*, 202 DPR en la pág. 853.

[21] Viruet *et al*. v SLG Casiano-Reyes, 194 DPR 271, 278 (2015).

[22] Cód. Seg. PR art. 11.250, 26 LPRA § 1125.

[23] *Rivera Matos,* 204 DPR en la pág. 1021.

[24] *S.L G. Francis-Acevedo*, 204 DPR en las págs. 385-386.

todos los contratos- constituyen la ley entre las partes y, consecuentemente, obligan.[25] Es necesario, no obstante, que se "cumplan con los requisitos de los contratos en general, a saber, el consentimiento de los contratantes, el objeto cierto y la causa de la obligación que se genera".[26]

Ante la ocurrencia del evento incierto previsto en el contrato, el asegurado debe presentar su reclamación y la aseguradora está obligada a resolverla. En particular, el Art. 27.162 del Código de Seguros establece que la aseguradora debe realizar la investigación, el ajuste y la resolución de la reclamación en el periodo razonablemente más corto dentro de 90 días después del reclamo.[27]

En lo pertinente a la controversia ante nuestra consideración, vemos que el paso del Huracán María y los estragos que causó alteraron el modo de vida de los puertorriqueños. Esto llevó a la presentación de múltiples medidas legislativas y la adopción de nuevas políticas públicas.[28] Al recibir constantes quejas del consumidor

---

[25] *Íd.*, pág. 386.

[26] *Íd.*

[27] CÓD. SEG. PR art. 27.162, 26 LPRA § 2716b.

[28] Exposición de motivos de la Ley Núm. 14-2020. De otra parte, y a modo de ejemplo, en el estado de Luisiana -de tradición civilista con un código civil similar al nuestro y donde, además, se incorporó la figura del pago en finiquito mediante jurisprudencia- a raíz del desastre del Huracán Katrina se creó un sistema de mediación ("*Hurricane Katrina homeowners Mediation Program*") para atender y negociar las reclamaciones de los asegurados a las aseguradoras sobre daños a su propiedad y, consecuentemente, poder llegar a acuerdos. Cabe destacar que para llegar a concretarse un pago en finiquito las partes debían pasar por un proceso de mediación y un contrato por escrito que, a su vez, cumplía con los requisitos de la transacción tipificada en el Código Civil de Luisiana. En particular, esos contratos tenían una cláusula a favor del asegurado en la que se le otorgaba un periodo de tres días para retractarse de este pacto. Además, como requisito de la mediación, las partes venían obligadas a mediar de buena fe. De lo contrario, el mediador podía

relativas al proceso de reclamo, evaluación de daños y pago por parte de las aseguradoras, el Legislador creó la Carta de Derechos del Consumidor de Seguros. Esto, con el fin de facilitar que los consumidores de seguros conocieran sus derechos fundamentales enunciados a través del Código de Seguros y su Reglamento.[29] De lo contrario, "para poder conocer estos derechos básicos, el consumidor tendría que recurrir a una gama de disposiciones legales en el Código y su Reglamento para poder atinar con ellos".[30]

En ánimos de evitar esta dificultad se recogió en un solo artículo la Carta de Derechos del Consumidor de Seguros. En específico y en lo que nos es pertinente, esta Carta dispone lo siguiente:

> El Consumidor de Seguros de Puerto Rico disfrutará de todos los derechos que le son reconocidos en las leyes y reglamentos que les sean aplicables, incluyendo, pero sin limitarse a los siguientes:
>
> .    .    .    .    .    .    .    .    .
>
> (e) Derecho a que quien le gestiona su póliza le provea una **orientación clara** y completa sobre la cubierta, beneficios, límites y exclusiones de la póliza, así como los deberes y obligaciones del asegurado.
>
> .    .    .    .    .    .    .    .    .
>
> (i) Derecho a que el asegurador actúe de **buena fe**, de forma justa y equitativa **al evaluar y resolver su reclamación**.

---

concluir la mediación si alguna de las partes incumplía con este precepto. Adviértase que este programa fue creado con el esfuerzo de colaboradores tales como la gobernadora de Luisiana, el comisionado de seguros, el presidente del Louisiana State Bar Association, un juez del Tribunal Supremo de Louisiana y representantes del American Arbitration Association. *Véase*, Michael v. Allstate, 2008 WL 11515852; M. A. Patterson, *Evaluating the Louisiana Department of Insurance's Hurricane Katrina Homeowners Mediation Program,* Disp. Resol. J. 34 (2007).

[29] Exposición de motivos de la Ley Núm. 14-2020.

[30] *Íd.*

**(j) Derecho a que el asegurador le envíe su oferta con desglose del ajuste para su evaluación, antes de recibir un cheque que usted no ha aceptado, o concurrentemente con el cheque, sin que se entienda que el simple recibo del mismo significa una renuncia a sus reclamaciones.**

.    .    .    .    .    .    .    .

(o) Derecho a solicitar una reconsideración a la determinación del asegurador respecto a su reclamación, y que la misma sea atendida y resuelta dentro del término de 30 días de presentada la solicitud.[31]

A su vez y como consecuencia del paso del Huracán María, el Comisionado de Seguros -ente encargado de velar, fiscalizar y reglamentar el cumplimiento con las disposiciones del Código de Seguros- emitió la Carta Circular de 2 de octubre de 2017 (Núm. CC-2017-1911D). En lo pertinente, el cuerpo de la Carta lee como sigue:

Ante el estado de emergencia y pérdidas sufridas a raíz del embate del Huracán María por nuestra Isla y con el propósito de velar por el interés público que venimos llamados a proteger, debemos ser enfáticos y recordarles el **cumplimiento estricto de las disposiciones del Código de Seguros y su Reglamento,** especialmente aquellas disposiciones del Capítulo 27 del Código relacionadas con las prácticas prohibidas **y los métodos razonables para la investigación y ajuste de las reclamaciones.** A modo de recordatorio, algunos de los conceptos establecidos en el Código de Seguros y su Reglamento con los cuales todo asegurador debe cumplir en la investigación y ajuste de reclamaciones son:

.    .    .    .    .    .    .    .

3. Proveer a los reclamantes **una adecuada orientación y asistencia clara** y precisa, manteniendo la comunicación de una manera cortés y servicial.

4. Hacer manifestaciones y representaciones ciertas y correctas sobre los hechos y los términos de una póliza **y ofrecer explicaciones razonables para la denegación de una reclamación u oferta de transacción.**

5. Llevar a cabo una investigación razonable basada en la información disponible **y realizar el ajuste rápido, justo y equitativo de una reclamación.**

6. Ofrecer al reclamante aquellas cantidades que dentro de los términos de la póliza sean justas y razonables, y sobre las cuales el reclamante razonablemente tenga derecho, **sin tratar de transigir la reclamación por una**

---

[31] CÓD. SEG. PR art. 1.120, 26 LPRA § 118.

**cantidad irrazonablemente menor a la que se tiene derecho.**

7. **No transigir una reclamación sin el consentimiento o conocimiento del asegurado.**

8. No obligar a los reclamantes a entablar pleitos para recobrar bajo la póliza **porque se le ha ofrecido una cantidad sustancialmente menor a la que tiene derecho** o porque se le ha negado incorrectamente la cubierta.

.     .     .     .     .     .     .     .     .

10. Cuando se requiera la firma de un relevo, que el mismo **no pueda ser interpretado como que se releva de aquellas obligaciones que no fueron objeto de la transacción.**

11. Acompañar los pagos de las reclamaciones de una declaración que establezca la cubierta bajo la cual se realiza el pago e incluya todas las cantidades que deban ser incluidas de acuerdo con la reclamación y los límites de la cubierta.

Es sumamente importante que se tomen todas las medidas necesarias para agilizar la resolución de todas las reclamaciones que se les presenten.

**Se requiere el estricto cumplimiento con la presente Carta Circular.**

Por último, el Art. 27.163 del Código de Seguros enumera los métodos para resolver una reclamación presentada por su asegurado, a saber: (1) el pago total de la reclamación, (2) la denegación escrita y debidamente fundamentada de la reclamación y (3) el cierre de la reclamación por inactividad del reclamante, cuando el reclamante no coopere o no entregue la información necesaria para que el asegurador pueda ajustar la reclamación.[32] Ahora bien, en cuanto a los pagos parciales o en adelantos ante un evento catastrófico, el Código de Seguros estatuye lo siguiente:

(d) **La aceptación de un pago parcial o en adelanto por el asegurado reclamante no constituirá, ni podrá ser interpretado, como un pago en finiquito** o renuncia a cualquier derecho o defensa que éste pueda tener sobre los otros asuntos de la reclamación en controversia que no estén contenidos

---

[32] 26 LPRA § 2716c.

expresamente en la declaración de oferta de pago parcial o en adelanto.

(e) El pago parcial o en adelanto **no constituirá una resolución final de la totalidad de la reclamación con arreglo a los Artículos 27.162 y 27.163 de este Código.**[33]

El citado Art. 27.166 del Código de Seguros también fue incorporado como consecuencia del paso del Huracán María para manejar las reclamaciones pendientes y ordenar a los aseguradores de la propiedad a "emitir pagos parciales o en adelantos al asegurado o reclamante luego de un evento catastrófico de las partidas que no estén en controversia y para otros asuntos relacionados".[34] Lo anterior, con el propósito de "estimular pagos a los asegurados o reclamantes afectados para que puedan comenzar los arreglos para la reconstrucción o reparación de sus residencias y para iniciar la operación de los comercios, ayudando así a reactivar nuestra economía con mayor prontitud".[35]

Tal principio también estaba estatuido en el Art. 1123 del derogado Código Civil, que, en lo pertinente, disponía que un acreedor no podía ser obligado —a menos que el contrato expresamente lo autorizara— a recibir las prestaciones de la obligación de forma parcial.[36] Ahora bien, según lo

---

[33] *Íd.* § 2716f (énfasis suplido).

[34] Exposición de motivos de la Ley Núm. 243-2018.

[35] *Íd.*

[36] Cod. Civ. PR art. 1123, 31 LPRA § 3173 (derogado 2020). Al respecto y específicamente en el contexto de la figura del pago en finiquito, en City of San Juan v. St. Johns's Gas Co., 195 US 510, 522 (1904), el Tribunal Supremo Federal expresó: "Conceding, without so deciding, that such rule was controlling in Porto Rico, we think it is not applicable to the case in hand" because "where a liquidated sum is due, the payment of a lesser sum in satisfaction thereof, though accepted as satisfaction, is not binding as such, for want of consideration". *Véase,* A. Soler

establecía igual disposición, "cuando la deuda tuviere una parte líquida y otra ilíquida, podrá exigir el acreedor, y el deudor puede hacer el pago de la primera, sin esperar a que se liquide la segunda".[37]

## B. La figura jurídica de la transacción y el pago en finiquito

El Art. 1709 del Código Civil de 1930 establecía que "[l]a transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado".[38] Así, los elementos constitutivos de un contrato de transacción son los siguientes: (1) una relación jurídica incierta y litigiosa, (2) la intención de los contratantes de componer el litigio y sustituir la relación dudosa por otra cierta e incontestable y (3) las reciprocas concesiones de las partes.[39] Nótese que toda transacción parte de la premisa de que las partes tienen dudas sobre la validez o

---

Bonnin, *A Case of Legal Transplanting: Datio in Solutum et al v. Accord and Satisfaction*, 25 Rev Der. PR. 421 (1986).

[37] 31 LPRA § 3173 (derogado 2020). El citado artículo actualmente está codificado en el Art. 1119 del Código Civil y lee de la siguiente manera:
    El acreedor no puede ser compelido a recibir parcialmente las prestaciones en las que consiste la obligación, salvo cuando el contrato o la ley expresamente lo autorizan.

    Sin embargo, si la deuda tiene una parte líquida y otra ilíquida, el acreedor puede exigir, y el deudor puede hacer el pago de la primera, sin esperar a que se liquide la segunda. 31 LPRA § 9143.

[38] 31 LPRA § 4821 (derogado 2020). El actual, sustituye al citado artículo y establece que "[p]or el contrato de transacción, mediante concesiones recíprocas, las partes ponen fin a un litigio o a su incertidumbre sobre una relación jurídica". 31 LPRA § 10641 (2020).

[39] Mun. San Juan v. Prof. Research, 171 DPR 219, 239 (2007).

corrección jurídica de sus respectivas pretensiones y eligen resolver las diferencias mediante mutuas concesiones.[40]

Como todo contrato, la transacción debe contar con consentimiento, objeto y causa. Con respecto a la causa en el contrato de transacción, hemos establecido que "[e]n conjunto, el litigio y las recíprocas concesiones constituyen los elementos de la causa".[41] En consecuencia, "[e]s necesario que cada uno de los contratantes reduzca y sacrifique a favor de otro una parte de sus exigencias a cambio de recibir una parte de aquello objeto del litigio".[42]

En particular, el Art. 1503 del actual Código Civil al establecer la forma de la transacción, incluye el pago en finiquito, y establece lo siguiente:

> La transacción debe constar en un **escrito firmado por las partes** o en una resolución o una sentencia dictada por el tribunal. Si se refiere a derechos constituidos mediante escritura pública, se requiere esta formalidad. La inobservancia de estas reglas la hace nula.
>
> **El pago en finiquito tiene aquellos efectos que la ley establece.**[43]

Con respecto a esto último, el Profesor Miguel R. Garay Aubán comenta que, en su redacción final, el artículo admitió la doctrina de pago en finiquito regulada desde 1998 en la Sección 2-311 de la Ley de Transacciones Comerciales. Añade que el borrador suprimía el pago en finiquito, debido a que

---

[40] *Íd.*

[41] *Íd.*

[42] *Íd.*

[43] 31 LPRA § 10647 (énfasis suplido). Adviértase que este artículo no tiene precedente en el derogado Código Civil, por lo que se incluye para informar sobre cómo el Legislador consideró la figura.

el Memorial Explicativo del Borrador inicial exponía erradamente que esta figura no tenía reconocimiento legal en Puerto Rico. Esto, en aparente desconocimiento de que estaba regulada por la mencionada legislación.[44]

Sobre el alcance de los contratos de transacción, vemos que ésta "no comprende sino los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma".[45] Así, "[l]a renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre que ha recaído la transacción".[46] Esto es, "estando rigurosamente limitada tal interpretación a los objetos *expresamente* determinados en ella o que, por una inducción *necesaria* de sus palabras, deban reputarse comprendidos en ésta".[47]

Por otro lado, en cuanto a las circunstancias en las que una transacción no será válida, el Art. 1504 del actual Código Civil dispone que, además de las causas que invalidan todo acto jurídico, una transacción será inválida cuando:

> (a) La situación que la genera no se corresponde con los hechos reales y el litigio o la incertidumbre no hubieran aparecido de haberse conocido la situación real;
>
> (b) incluye títulos total o parcialmente inexistentes;
>
> (c) incluye títulos sobre los cuales se ignora que existe otro mejor;

---

[44] M. R. Garay Aubán, *Código Civil 2020 y su Historial Legislativo*, 1ra ed., Ed. SITUM, 2020, págs. 1046-1047.

[45] 31 LPRA § 4826 (derogado 2020). Por su parte, el Art. 1499 del actual Código Civil establece que "[e]l contrato de transacción se interpreta restrictivamente". 31 LPRA § 10643 (2020).

[46] *Íd*.

[47] *Rivera Rodríguez*, 168 DPR en la pág. 208.

(d) incluye aspectos sobre los cuales se ignora que ya están resueltos mediante sentencia firme; o

(e) la efectividad de una prestación es insegura.[48]

Este artículo advierte que no cualquier incertidumbre da lugar a la transacción, sino que debe tratarse de una transacción que ponga fin a las discusiones e incertidumbres que experimentan las partes. Además, esa incertidumbre debe tener como objeto una duda verdaderamente racional.[49]

En particular, el pago en finiquito ("*accord and satisfaction*") es una forma de extinguir las obligaciones.[50] Esta figura del derecho común se incorporó a nuestro ordenamiento jurídico mediante jurisprudencia.[51] Fue en *City of San Juan v. St. John's Gas Co.* que el Tribunal Supremo de Estados Unidos resolvió que la figura de pago en finiquito regía en Puerto Rico, tras concluir que como la doctrina estaba cimentada en los principios del derecho romano aplicados bajo el Código Napoleónico, operaba también en el Derecho Civil español.[52]

Posteriormente, en *López v. South PR Sugar Co.* este Foro atendió una controversia contractual a la luz del pago en finiquito y aunque la figura fue validada no prosperó, puesto

---

[48] 31 LPRA § 10648 (2020). Este artículo no tiene precedente en el derogado Código Civil. Sin embargo, se expone para informar sobre el desarrollo de la figura.

[49] Garay Aubán, *op. cit.*, pág. 1047.

[50] A. Martínez & Co. v. Long Const. Co., 101 DPR 830, 834 (1973).

[51] López v. South PR Sugar Co., 62 DPR 238 (1943); *City of San Juan v. St. Johns's Gas Co*, 195 US 510, 521 (1904).

[52] City of San Juan, 195 US en la pág. 521.

que no se cumplieron los requisitos.[53] En específico, allí dijimos que para que operara la figura se exigía el concurso de los requisitos siguientes: (1) Una reclamación ilíquida o sobre la cual exista controversia *bona fide*; (2) un ofrecimiento de pago por el deudor; y (3) una aceptación del ofrecimiento de pago por el acreedor.[54]

Tiempo después, modificamos el primer requisito y establecimos que -para que se configure la figura o aplique el pago en finiquito- también será requisito "la ausencia de opresión o indebida ventaja de parte del deudor sobre su acreedor".[55]

Así, puntualizamos sobre la importancia de evaluar con detenimiento el factor de la ausencia de opresión de la deudora sobre su acreedora cuando se invoca la doctrina de pago en finiquito.[56] Más importante aún, fuimos enfáticos al establecer que la figura prevalecerá solamente en circunstancias en las que no exista opresión o indebida ventaja de parte del deudor y en las cuales medien circunstancias claramente indicativas de que el deudor pretende extinguir su obligación.[57] Así, aludimos a que tiene que existir un claro entendimiento por parte de quien acepta

---

[53] *López v. South PR Sugar Co.*, 62 DPR en las págs. 245-246.

[54] *Íd.*, págs. 244-245.

[55] *A. Martínez & Co.*, 101 DPR en las pág. 833-835; H.R. Elec., Inc. v. Rodríguez, 114 DPR 236, 241 (1983).

[56] *A. Martínez & Co.,* 101 DPR en la pág. 833.

[57] *Íd.*, págs. 834-835.

que el pago representa un pago total, en saldo y final de la obligación.[58]

Al describir la figura, este Tribunal pronunció que el pago en finiquito es paralelo al contrato de transacción. En específico, expresamos que "[e]l contrato de acuerdo y pago (accord and satisfaction), al igual que su paralelo de mayor solemnidad la transacción, es accesorio, consensual, bilateral y oneroso".[59]

También, señalamos que la figura del pago en finiquito "en cierto modo opera en un área de contratación rápida propia de nuestros días y es más asequible para la terminación en corto plazo de diferencias, incertidumbres y mutuas reclamaciones que el contrato de transacción definido en el Art. 1709 del Código Civil (31 LPRA sec. 4821) el cual generalmente nace de un pleito pendiente o a punto de comenzar".[60] De igual modo, "[p]or su viabilidad, su liberación de requisitos formales y prontitud de su acción suplantando la contienda y la incertidumbre por la ocurrencia de opuestas pretensiones, podríase llamar al accord and satisfaction la transacción al instante".[61]

Al determinar si la figura del pago en finiquito se concreta o no, hemos sido muy rigurosos en la evaluación del concurso de todos sus requisitos. Nótese que la doctrina no

---

[58] *Íd.*

[59] *Íd.*, pág. 835.

[60] *Íd.*, págs. 833-834.

[61] *Íd.*, pág. 834.

ha prevalecido como fuente de extinción de una obligación en prácticamente ninguno de los casos en los que este Foro ha tenido la oportunidad de evaluar la invocación de la defensa. Sobre el primer requisito, entiéndase la existencia de una reclamación ilíquida o sobre la cual exista controversia *bona fide*, en el caso de *López v. South PR Sugar Co.,* determinamos que en ausencia de este requisito no se concreta la figura de pago en finiquito. Allí, un agricultor y una central azucarera realizaron un contrato para la molienda de la caña de azúcar. Posteriormente, surgió una controversia relativa a unos descuentos en el pago que la central había hecho por concepto de ensacado y flete, toda vez que el colono alegaba que el descuento no podía ser mayor de 15¢, mientras que la central alegaba que no podía ser mayor de 25¢. Los cheques que la central le enviaba al agricultor hacían constar en el dorso que el endoso del instrumento constituía un reconocimiento de pago en saldo. El agricultor cobró los cheques y luego demandó a la central azucarera por la diferencia adeudada. En respuesta, la central azucarera alegó que el agricultor estaba impedido de demandar en virtud de la doctrina de pago en finiquito.

Evaluados los argumentos en *López v. South PR Sugar Co.,* expresamos que -a pesar de que no había duda sobre el ofrecimiento ni de la aceptación del pago- no existía una reclamación ilíquida o una controversia *bona fide*. Esto, toda vez que la reclamación no era ilíquida porque la Ley que regía las liquidaciones relativas a la molienda de caña de

azúcar claramente establecían que la central no podía descontar más de 15 centavos.[62]

Asimismo, en *Pagán Fortis v. Garriga*, establecimos que no se concretó la figura de pago en finiquito debido a que no existía el elemento de una controversia ilíquida.[63] En el citado caso unos contratistas suscribieron un contrato de obras para la construcción de un edificio por la cantidad de $26,000. El precio estipulado para construir la obra no incluía los planos y tampoco unos cambios solicitados posteriormente por el contratista relativos a la construcción de un mirador, un cambio en las ventanas y en la pintura. Culminada la obra, el constructor había recibido $25,000. Posteriormente, el contratista le envió al constructor un cheque por $1,000 el cual advertía que era en pago total. El constructor endosó el cheque e hizo constar que era en pago parcial y cursó una comunicación al contratista dejándole saber que le abonaba los $1,000 del total adeudado. Sin embargo, el contratista le respondió que no le debía nada. Así, el constructor demandó al contratista para cobrar el resto de la deuda y este último levantó la defensa afirmativa de pago en finiquito. Evaluada la figura, razonamos lo siguiente:

> Claramente con la evidencia que tuvo ante sí el juez sentenciador no podía concluirse que la aceptación del pago de los $1,000 constituía el saldo de toda la acreencia que el demandante tenía contra el demandado. **Al enviar el cheque por $1,000 el demandado estaba pagando lo que adeudaba del contrato original [los originales $26,000], una cantidad líquida sobre la cual no había controversia.** El demandado había aceptado que debía esa cantidad. No se efectuó pago

---

[62] *López*, 62 DPR en las págs. 245-246.

[63] Pagán Fortis v. Garriga, 88 DPR 279, 283-284 (1963).

alguno en exceso de esa suma que pudiera considerarse que su aceptación saldaba las partidas que excedían la suma líquida adeudada del contrato original. Faltaba pues el primero de los tres requisitos que en López v. South P.R. Co., expusimos eran necesarios concurrieran para que pudiera considerarse que la aceptación de una suma menor que la debida constituía un pago total de la acreencia. En López también concluimos que faltaba ese requisito.[64]

De otra parte y con relación al segundo requisito, el ofrecimiento, este Foro estableció que "el ofrecimiento de pago tiene que ir acompañado por declaraciones o actos que claramente indiquen que el pago ofrecido por el deudor al acreedor es en pago total, completo y definitivo de la deuda existente entre ambos…".[65] A su vez, la doctrina requiere que el ofrecimiento sea de buena fe.[66] En fin, el ofrecimiento del pago debe sujetarse a la condición de que de aceptarlo se entenderá en saldo de su reclamación.[67]

Sobre el tercer requisito, vemos que la aceptación del ofrecimiento se perfecciona cuando el acreedor retiene el cheque y consiente bajo la premisa de que el instrumento fue remitido en concepto de pago y saldo total de la obligación.[68] Sin embargo, para que la retención del cheque constituya una aceptación no puede haber opresión o indebida ventaja de parte del deudor.[69]

---

[64] *Íd.* (énfasis suplido).

[65] *H.R. Elec.,* 114 DPR en la pág. 242.

[66] *López,* 2 DPR en la pág. 245; *H.R. Elec.,* 114 DPR en la pág. 240.

[67] *H.R. Elec. Véase, además*, Gilormini Merle v. Pujals Ayala, 116 DPR 482, 484-485 (1985).

[68] *A. Martínez & Co.,* 101 DPR en la pág. 834.

[69] *Íd.*

Sobre la figura del pago en finiquito, el Profesor José R. Vélez Torres comenta que hay que evaluarla a la luz de la figura de la transacción codificada en el Código Civil.[70] Por su parte, el Profesor Garay Aubán explica que la figura del pago en finiquito "opera en la práctica como un método informal de resolución de controversias que se lleva a cabo mediante el uso de un instrumento negociable y en ese sentido podría decirse que se trata de un caso peculiar de contrato de transacción".[71]

**Sobre las transacciones y su aplicación en la industria de seguros**, *en Carpets & Rugs v. Tropical Reps* resolvimos que los requisitos para la validez de un contrato de transacción es que exista una controversia entre las partes, que las partes tengan la intención de sustituir la incertidumbre jurídica en la que se encuentran con la transacción y que existan mutuas concesiones.[72] Al ser consensual, el contrato de transacción "tiene necesariamente que referirse a una comunicación u oferta que nazca de la voluntad de una de las partes implicadas en la controversia".[73] Entiéndase que **"[n]o puede referirse a comunicaciones u ofertas que una de las partes realice en**

---

[70] J.R Vélez Torres, *Derecho de Obligaciones*, 2da ed., Puerto Rico, Programa de Educación Jurídica Continua, 1997, págs. 241-250.

[71] M. R. Garay Aubán, *Sistemas de pago*, Ed. SITUM, 2003, pág. 24.

[72] Carpets & Rugs v. Tropical Reps, 175 DPR 615, 630 (2009).

[73] *Íd.*, pág. 631.

**cumplimiento de un mandato de ley o por una obligación anterior".**[74]

De manera que, cuando la aseguradora cumple con su obligación de enviar una oferta razonable al asegurado, esta constituye meramente el estimado de los daños sufridos.[75] Así, el documento que emite el asegurador producto de una investigación y análisis detenido constituye puramente la postura institucional del asegurador frente a la reclamación de su asegurado.[76] Es decir, un reconocimiento de deuda al menos en cuanto a las sumas ofrecidas como ajuste, pero no una oferta producto de una controversia *bona fide* o la iliquidez de la deuda, en este caso, de la reclamación del asegurado.[77] Nótese que "en dicho documento **no existen concesiones del asegurador hacia su asegurado,** pues se trata de un informe objetivo del asegurador en cuanto a la procedencia de la **reclamación y la existencia de cubierta según la póliza".**[78] **Por ende, al emitir el informe de ajuste no hay una controversia *bona fide* entre asegurador y asegurado.**[79]

Entonces, allí reiteramos que una carta emitida por parte de una aseguradora a su asegurado como parte de su

---

[74] *Íd.,* pág. 632 (énfasis suplido).

[75] *Íd.,* pág. 635.

[76] *Íd.*

[77] *Íd.*

[78] *Íd.* (énfasis suplido).

[79] *Íd.,* pág. 639.

obligación al amparo del Código de Seguros para resolver la reclamación no puede constituir una transacción.[80] Así, cuando la aseguradora cumple estrictamente con su deber estatutario establecido en el Art. 27.162 del Código de Seguros, ello no es indicativo de una oferta de transacción, por no ser un acto voluntario en el proceso de negociación para sustituir la incertidumbre jurídica o evitar el inicio de un pleito.[81] Así, y como tal ofrecimiento no es producto de alguna diferencia en las respectivas pretensiones de asegurador y asegurado (iliquidez de la deuda), **no cumple con el requisito de la doctrina de pago en finiquito, esto es, la existencia de una reclamación ilíquida o sobre la cual exista una controversia *bona fide*.**

Lo anterior, "no quiere decir que, con ese documento como base de negociación, asegurador y asegurado puedan considerar llegar a un contrato de transacción de la reclamación".[82] Entiéndase que "[l]as posibilidades de transacción entre asegurador y asegurado sólo estarán limitadas por lo que en su día el asegurador informó como procedente en su comunicación o postura inicial".[83] Siendo ello así, "el asegurado podría renunciar a ciertas partidas a cambio de que el asegurador acepte otras que inicialmente

---

[80] *Íd.*

[81] *Íd.*, pág. 627.

[82] *Íd.*, pág. 636.

[83] *Íd.*

estimó improcedente o se modifiquen sumas de las ofrecidas originalmente".[84]

## C. La *Ley de Transacciones Comerciales* y el pago en finiquito

La *Ley de Transacciones Comerciales* codifica la jurisprudencia sobre el pago en finiquito antes citada con ciertas variantes a considerar.[85] En lo pertinente, la Sección 2-311 establece lo siguiente:

> (a) Si una persona contra quien se hace una reclamación prueba que: (i) **ofreció de buena fe** un instrumento al reclamante en pago total de la reclamación, (ii) el monto de la reclamación no había sido liquidado **o estaba sujeto a una controversia *bona fide***, y (iii) el reclamante obtuvo el pago del instrumento, los siguientes incisos serán de aplicación.
>
> (b) A menos que aplique el inciso (c) de esta sección, si la persona contra quien se establece la reclamación prueba que el instrumento o una comunicación escrita que le acompaña contiene una **declaración conspicua** a los efectos de que el instrumento fue ofrecido en pago total de la reclamación, la reclamación queda saldada.
>
> (c) Sujeto a lo dispuesto en el inciso (d) de esta sección, una reclamación no queda saldada bajo las disposiciones del inciso (b) de esta sección en cualquiera de las siguientes situaciones:
>
> .    .    .    .    .    .    .    .
>
> (2) El reclamante, sea o no una organización, prueba que dentro de los noventa (90) días siguientes al pago del instrumento, ofreció el repago de la cantidad de dinero especificada en el instrumento a la persona contra quien se establece la reclamación. Este inciso no será de aplicación si el reclamante es una organización que envió una declaración en cumplimiento con lo dispuesto con la cláusula (1)(i) de este inciso.
>
> (d) Se salda una reclamación si la persona contra quien se incoa prueba, que dentro de un tiempo razonable con anterioridad al inicio del procedimiento de cobro del instrumento, el reclamante o un agente de éste con responsabilidad directa respecto a la obligación en disputa, sabía que el instrumento fue ofrecido en saldo total de la reclamación.[86]

---

[84] *Íd.*

[85] Ley de Transacciones Comerciales, Ley Núm. 208-1995, 19 LPRA §§ 401-2409.

[86] 19 LPRA § 611 (énfasis suplido).

Es evidente que la citada disposición requiere como condición para que se configure el pago en finiquito la existencia de los siguientes requisitos: (1) que el deudor ofrezca de buena fe el instrumento al reclamante en pago total de la reclamación, (2) la existencia de una reclamación ilíquida o una controversia *bona fide*, y (3) que el reclamante haya obtenido el pago del instrumento. Adviértase que el estatuto impone el peso de la prueba a la persona contra la cual se hace el reclamo.

De entrada, estos requisitos son cónsonos con los establecidos jurisprudencialmente. No obstante, vemos que la *Ley de Transacciones Comerciales* impone más restricciones para que se configure la figura de pago en finiquito. Sobre el requisito del ofrecimiento del instrumento negociable en pago total de una reclamación, requiere que se haga de buena fe. La propia *Ley de Transacciones Comerciales* define "buena fe" como "la honestidad de hecho y **la observancia de las normas comerciales razonables de trato justo**".[87]

La mencionada Ley también requiere que la declaración de la oferta sea **conspicua** a los efectos de que el instrumento fue ofrecido en pago total de la reclamación. La propia Ley define el término "conspicuo" como sigue:

> Un término de una cláusula es conspicuo cuando está redactado de tal forma que una persona razonable, que será afectada por el mismo, deberá notarlo. Un **encabezamiento** escrito en letras mayúsculas (e.g **CARTA** DE PORTE NO NEGOCIABLE) es conspicuo. Un lenguaje en el **texto de un**

---

[87] *Íd*. § 503 (énfasis suplido). Por esta expresión, es necesario acudir a la regulación del contrato de seguros anteriormente esbozada para conocer lo que es razonable y un trato justo en esa industria, a saber: proveer una adecuada orientación, asistencia, etc. *Véase, además,* Rosario v. Nationwide Mutual, 158 DPR 775 (2003).

**formulario es** 'conspicuo' si está escrito en **letras más grandes o en otro tipo de letra o color**. […].[88]

Esta legislación establece que "[l]a determinación de si un término o cláusula es 'conspicuo' o no, corresponderá a los tribunales".[89]

Por último, esta disposición permite el ofrecimiento del repago de la cantidad de dinero especificada en el cheque dentro de los noventa (90) días siguientes al pago del instrumento.[90] **Del propio texto de la *Ley de Transacciones Comerciales* queda claro que el mero cambio del cheque no configura de forma automática la figura de pago en finiquito.**

Al respecto, el Profesor Garay Aubán explica que -como regla general- si se cumplen los tres requisitos previamente enunciados se configura el pago en finiquito y la reclamación se extingue. No obstante, comenta que -mediante excepción y a pesar de cumplirse con los requisitos- si la persona cobra el cheque sin darse cuenta de que era un pago ofrecido en saldo total de la reclamación, aplica el término de gracia. Ahora bien, si se prueba que la persona cobró el cheque a sabiendas, el periodo de gracia no aplica. Entiéndase que el período de gracia es para que el acreedor se dé cuenta de la situación, no para que cambie de parecer.[91]

Entendemos que la aplicación de esta excepción o término de gracia para hacer el repago de la cantidad incluida en el

---

[88] *Íd*. § 451 (énfasis suplido).

[89] *Íd*.

[90] 19 LPRA § 451 (énfasis suplido).

[91] Garay Aubán, *op. cit*, págs. 29-30.

cheque es un asunto que compete dirimir a los tribunales, al igual que el cumplimiento con la declaración conspicua por parte del asegurador. Nótese que en el pasado este Tribunal ha denegado la procedencia de la sentencia sumaria para resolver la aplicación de la defensa de pago en finiquito cuando había controversia de hechos de si el demandado "aceptó, expresa o tácitamente, los cambios en el endoso [del cheque] efectuados en su presencia [por la parte demandante a los efectos de que solo era un pago parcial], asunto que debe ventilarse en juicio plenario").[92]

### III

En este caso, el asegurado argumenta que los foros *a quo* erraron al razonar que se configuraron los requisitos de la figura de pago en finiquito y, en consecuencia, concluir que no existían hechos en controversia que impidieran dictar sentencia sumaria desestimatoria. Es claro que le asiste la razón.

Como mencionáramos, para resolver la controversia ante nuestra consideración debemos evaluar cómo opera la figura del pago en finiquito en el campo de seguros con las regulaciones particulares de esta industria. Asimismo, debemos evaluarla en el contexto de la relación entre aseguradora y asegurado. Además, por tratarse de un pago mediante un instrumento negociable (cheque), precisa que evaluemos la figura en virtud de lo estatuido en la *Ley de Transacciones Comerciales*. Veamos.

---

[92] *Gilormini Merle*, 116 DPR en la pág. 485.

De una lectura de la Sentencia emitida por el Tribunal de Primera Instancia se desprende que, en su determinación, el tribunal tomó como hechos únicos y suficientes sobre los cuales no existía controversia para aplicar la figura de pago en finiquito los siguientes: el ofrecimiento del cheque en pago total, la notificación del cierre de la reclamación y el cambio del cheque.

De igual manera, el Tribunal de Apelaciones concluyó que procedía dictar sentencia sumaria debido a que se habían configurado todos los elementos del pago en finiquito. Sin embargo, su determinación se circunscribió a establecer que el requisito del ofrecimiento de pago "no se hizo mediando mala fe, sino que fue el resultado directo de la investigación y ajuste de la reclamación".[93] Sobre el requisito de la aceptación, el tribunal apelativo intermedio razonó que como el asegurado cambió el cheque y no solicitó reconsideración, ello era indicativo de la conformidad del asegurado con la aseguradora.

Vemos que, en sus determinaciones, tanto el tribunal de instancia como el foro intermedio aplicaron la figura de pago en finiquito de forma mecánica y no analizaron los requisitos jurisprudenciales de la figura, en particular nada se dijo sobre el requisito de la iliquidez o controversia *bona fide* de la reclamación. También se omitió lo relativo a las salvaguardas del Código de Seguros y las normas administrativas relacionadas, así como lo estatuido en la *Ley*

---

[93] *Apéndice de la Apelación,* pág. 311.

*de Transacciones Comerciales*, que requiere que la buena fe de la oferta sea tanto de hecho (ausencia de opresión o ventaja indebida por parte del deudor), como en el cumplimiento con las normas razonables de trato justo. **Esto es, las determinaciones de ambos foros se apartaron de la observación del derecho aplicable, a pesar de lo enfáticos que hemos sido mediante jurisprudencia de la importancia del cumplimiento de todos los requisitos a la hora de evaluar si procede o no la defensa del pago en finiquito.**

Así, lo único que establecieron los foros inferiores fue que la aseguradora envió una carta junto con un cheque al asegurado y que éste lo firmó y lo cambió. Sin embargo, como vimos en el derecho aplicable, el mero cambio del instrumento no representa por sí solo que se concretó la figura de pago en finiquito y, consecuentemente, el saldo de la deuda ni la extinción de la obligación.

Al evaluar minuciosamente las sentencias recurridas se denota que existe controversia en cuanto a la mayoría de los componentes de la figura del pago en finiquito. En primer lugar, con respecto al requisito de la existencia de una reclamación ilíquida o sobre la cual exista una controversia *bona fide,* nada se estableció. Ello, a pesar de que se ha puntualizado desde la adopción de esta figura en nuestro ordenamiento que, aunque no exista duda sobre el ofrecimiento ni la aceptación del pago, si no está el

elemento de la iliquidez no se concreta la figura.[94] Vemos que no se estableció las características del pago ofrecido. Tampoco se dijo sobre si el pago en cuestión se hizo al amparo o en cumplimiento de un mandato estatutario, que debe tenerse como un ofrecimiento de deuda.[95]

Sobre el elemento del ofrecimiento, no se desprende un análisis con respecto a la ausencia de opresión o ventaja indebida por parte del deudor y la relación entre el asegurado y la aseguradora, dentro del contexto del evento que motivó la reclamación. Asimismo, tampoco es patente la existencia de circunstancias claramente indicativas para el acreedor de lo que representaba el cheque, pues no quedó establecido si la carta advertía al asegurado de forma conspicua que el instrumento fue ofrecido en pago total de la reclamación. **Tampoco se analiza qué fue lo que la carta comunicó, si la misiva logró cumplir con las salvaguardas, restricciones y normas comerciales de trato justo estatuidas en el Código de Seguros, dirigidas a que el asegurado reciba una orientación clara que se desprenda de manifestaciones y representaciones ciertas y explicaciones razonables, incluido el estimado real de los daños sufridos por la propiedad asegurada.** Más importante aún, si la carta superó la exigencia de que el asegurado alcance un entendimiento claro.

---

[94] *City of San Juan*, 195 US en la pág. 522; *López*, 62 DPR en las págs. 245-246.

[95] *Carpets*, 175 DPR en las págs. 630-632.

De igual manera, no quedó establecido si de la carta remitida al asegurado surgía que el ofrecimiento del pago se sujetó a la condición de que de aceptarlo se entendería en saldo de su reclamación. Esto es, si se advirtió adecuadamente en la carta sobre las consecuencias de aceptar el pago y si esto último le impediría presentar una reconsideración o entablar posteriormente una demanda como la de autos.

Tampoco se desprende si el cheque contiene una expresión conspicua **conforme se define expresamente en la Ley**, la ubicación, el tamaño y color de la letra en la expresión del pago total y si esta advirtió adecuadamente al asegurado lo que implicaba.

En cuanto al tercer requisito, la aceptación (elemento directamente atado al requisito del ofrecimiento), vemos que existe controversia sobre qué entendimiento o bajo cuáles condiciones el asegurado cambió el cheque y si comprendió el alcance y los efectos que implicaba la aceptación. Entiéndase que no se estableció que hubo un entendimiento claro por parte del asegurado.[96]

Razonamos que un planteamiento sobre entendimiento claro del asegurado requiere especial atención en circunstancias en que el contrato entre las partes es uno de adhesión y cuya

---

[96] El que se concrete el entendimiento claro de una oferta de un pago total es de suma importancia, porque si por el contrario se entiende que es en pago parcial para comenzar a reconstruir su vivienda, este no podría resultar en un pago en finiquito, asunto que incide a su vez con el primer requisito de la iliquidez de la deuda. Véanse, 26 LPRA § 2716f y Cód. Civ. PR art. 1123, 31 LPRA § 3173.

industria por su vital trascendencia en el ámbito socioeconómico del País es una altamente regulada.[97] Por consiguiente, para que la figura del pago en finiquito prospere tienen que concretarse todos los requisitos jurisprudenciales propios de la figura y, además, deben hacerse valer las disposiciones estatuidas en el Código de Seguros, las normas administrativas relacionadas y la *Ley de Transacciones Comerciales*.

Puntualizamos, además, que "la renuncia de un derecho afirmativamente concedido por ley requiere que la parte renunciante conozca de forma cabal su derecho y haya tenido la intención clara de abandonarlo".[98]

Concluimos que no existe claridad sobre los hechos medulares, como tampoco si el asegurador cumplió con las normas razonables de trato justo en la industria de seguro, para establecer la procedencia de la figura de pago en finiquito mediante el mecanismo de sentencia sumaria.[99] Nada impide que en la relación aseguradora-asegurado ambas partes lleguen a un acuerdo y transen sus disputas. Tampoco hay impedimento en la utilización del mecanismo de sentencia

---

[97] *Véase*, *Rosario*, 158 DPR en la pág. 780 (caso que denegó la desestimación sumaria del pleito por la aplicación de la defensa de la transacción por no estar establecidas las condiciones en que la perjudicada suscribió el relevo que le presentó el ajustador de la aseguradora y su entendimiento sobre las consecuencias de suscribirlo. El Tribunal entendió que "existe la necesidad 'de proteger al consumidor en casos de contratos como el de [una póliza], que de ordinario son la parte más débil en este tipo de transacción'[citas omitidas]").

[98] Mendoza Aldarondo v. Asociación Empleados, 94 DPR 564, 577 (1967).

[99] *Vease, Gilormini Merle*, 116 DPR en la pág. 485 (no procedía la sentencia sumaria para resolver la procedencia de la defensa de pago en finiquito porque quedó trabada la controversia de hechos de si el demandado "aceptó, expresa o tácitamente, los cambios en el endoso [del cheque] efectuados en su presencia [por la parte demandante]").

sumaria si se dan los requisitos. Sin embargo, la evaluación *a posteriori* de estos alegados acuerdos en el contexto de una solicitud de sentencia sumaria y en el marco de un campo altamente regulado como la industria de seguros, precisa de nuestros tribunales la profundidad en el análisis y la certeza de que se ha cumplido con cada uno de los requisitos que las leyes aplicables y la jurisprudencia interpretativa ha establecido. El asunto no se puede analizar de forma tan simple y mecánica.

IV.

Por los fundamentos antes expuestos, revocamos la determinación del Tribunal de Apelaciones y, a su vez, ordenamos la devolución del caso al Tribunal de Primera Instancia para que proceda conforme a lo aquí resuelto.

Se dictará sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Ángel E. Feliciano Aguayo

    Peticionario

       v.

                      AC-2020-50

Mapfre Panamerican Insurance
Company

    Recurrido


SENTENCIA


En San Juan, Puerto Rico a 28 de mayo de 2021.

       Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, revocamos la determinación del Tribunal de Apelaciones y, a su vez, ordenamos la devolución del caso al Tribunal de Primera Instancia para que proceda conforme a lo aquí resuelto.

       Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco emitió Opinión Disidente. La Jueza Presidenta Oronoz Rodríguez está inhibida.


                  José Ignacio Campos Pérez
               Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Ángel E. Feliciano Aguayo<br><br>    Peticionario<br><br>    v.<br><br>Mapfre Panamerican Insurance Company<br><br>    Recurrido | AC-2020-50 |  |

Opinión Disidente emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 28 de mayo de 2021.

Disiento respetuosamente de la Opinión Mayoritaria. En años recientes este Tribunal ha plasmado pormenorizadamente las normas para examinar una Solicitud de Sentencia Sumaria y el modo correcto de revisarlas en apelación. De forma reiterada hemos resuelto que las alegaciones concluyentes de derecho son insuficientes para derrotar una solicitud de esta índole. Quien se opone al petitorio debe sustentar su posición con hechos y prueba. Los mencionados requerimientos no son meros formalismos, sino herramientas para disponer expeditamente de aquellos pleitos cuya resolución puede efectuarse sin la celebración de un Juicio. Sin embargo, la decisión emitida hoy por la Mayoría resulta contraria a estos preceptos.

En el caso de autos no habían hechos materiales en controversia que impidieran dictar Sentencia sumariamente. Por lo tanto, debimos entrar en los méritos de la controversia y resolver de una vez por todas la aplicabilidad

de la defensa de pago en finiquito en el contexto de una reclamación de seguros. Un deudor puede extinguir su deuda ilíquida mediante el envío de un cheque, siempre que este contenga una anotación clara a tales fines para el acreedor y el ofrecimiento de pago sea aceptado. El lenguaje utilizado por el deudor debe ser lo suficientemente comprensible para que una persona promedio con la habilidad de leer entienda lo que representa. De esto suceder, entonces el cobro del cheque, sin protesta, equivale a aceptar la oferta como un pago en finiquito de la obligación. Tras un análisis del derecho y su aplicación a los hechos incontrovertidos, debo concluir que procedía confirmar la Sentencia del foro *a quo* dado que se cumplen los elementos de la figura de pago en finiquito.

Con el propósito de poner en justa perspectiva los fundamentos que me motivan a emitir esta Opinión Disidente, a continuación reseño el tracto procesal del caso de epígrafe.

**I**

El 17 de septiembre de 2018, el Sr. Ángel E. Feliciano Aguayo, (peticionario) presentó una Demanda por incumplimiento de contrato contra Mapfre Pan American Insurance Company (MAPFRE). En síntesis, alegó que MAPFRE emitió una póliza para asegurar un bien inmueble de su pertenencia, el cual sufrió daños en 2017 a causa del Huracán María. Expresó que, tras iniciar una reclamación para obtener el desembolso de los daños conforme a la póliza de

seguros, un ajustador enviado por MAPFRE acudió a la propiedad para examinar y estimar los daños. Esbozó que los daños finalmente estimados eran contrarios a los términos de la póliza e impropiamente omitían o subvaloraban las pérdidas cubiertas. Adujo que MAPFRE actuó de manera dolosa, de mala fe e incurrió en prácticas desleales en el ajuste de su reclamación. Reclamó que se reconociera que los daños a la vivienda ascendían a ciento cincuenta y cuatro mil diecisiete dólares con veintitrés centavos ($154,017.23) y se le pagara tomando esa cantidad como base.

Por el otro lado, el 8 de mayo de 2019 MAPFRE presentó una *Moción de Desestimación y/o Sentencia Sumaria*. En esta, manifestó que le envió un cheque al peticionario por la cantidad de tres mil ochocientos setenta y ocho dólares ($3,878.00), el cual fue cobrado sin expresión de reserva alguna sobre el estimado de las pérdidas. Aseveró que el cheque indicaba que era en pago total y final de la reclamación por daños ocasionados por el Huracán María. Así, planteó que la causa de acción del peticionario carecía de méritos toda vez que este recibió el pago total de su reclamación y, con arreglo a la doctrina de pago en finiquito, estaba impedido de solicitar una compensación adicional.

En respuesta, el peticionario argumentó que existía controversia de hechos. Expresó que debía rechazarse la defensa de pago en finiquito porque MAPFRE la utilizó para eludir su obligación de investigar, ajustar y resolver su

reclamación adecuadamente. Expuso que la aseguradora intentó sustituir ese deber jurídico mediante el pago a una persona en extremo estado de necesidad y sin la facultad de ejercer una decisión informada, lo cual, de por sí, constituyó mala fe. Además, alegó que era improcedente reconocer la defensa de pago en finiquito pues lo pagado no era una cantidad ilíquida, sino el pago de una responsabilidad fijada por el Código de Seguros, *infra*.

Evaluadas las respectivas posiciones, el Tribunal de Primera Instancia dictó Sentencia Sumaria a favor de MAPFRE. Concluyó que, a tenor con la doctrina de pago en finiquito, la obligación quedó extinta cuando el peticionario endosó el cheque enviado por MAPFRE. Por lo tanto, desestimó la Demanda con perjuicio.

Inconforme, el peticionario recurrió ante el Tribunal de Apelaciones. El foro apelativo intermedio confirmó el dictamen emitido por el tribunal de instancia. Concluyó que se configuraron todos los elementos del pago en finiquito pues existía una reclamación contra MAPFRE por los daños sufridos al inmueble, la reclamación fue investigada, se hizo una oferta clara en pago total de la reclamación, y el peticionario aceptó la oferta al firmar y cobrar el cheque varios días después. Específicamente, el tribunal apelativo intermedio expresó que, junto con el cheque:

> [S]e incluyó todo el estimado de los daños y los ajustes realizados antes de emitir el cheque. Lo anterior nos lleva a concluir que el pago realizado por parte de la aseguradora no se hizo mediando mala fe, sino que fue el resultado

directo de la investigación y ajuste de la reclamación. Al cursarse la oferta, nos resulta claro que se hizo cumpliendo con los requerimientos del Código de Seguros y con el propósito claro de culminar la reclamación. De otra parte, nada en el lenguaje revela intención de confundir de parte de la aseguradora. **Por el contrario, Mapfre le detalló a Feliciano Aguayo los pormenores de sus daños y, además, el procedimiento de reconsideración que tenía a su disposición, en caso de no estar de acuerdo con la conclusión de la aseguradora. A pesar de ello, Feliciano Aguayo no solicitó reconsideración de esta decisión.**

Surge del propio cheque, que Feliciano Aguayo firmó el cheque, lo cobró **y no presentó reconsideración alguna ante la aseguradora,** lo cual nos refleja su conformidad con la conclusión de la aseguradora. Sentencia de 30 de junio de 2020, Apéndice de la Apelación, págs. 311-312.

Aun en desacuerdo, el peticionario recurrió ante nos y señaló que erraron los foros *a quo* al resolver que no existían hechos materiales en controversia. Arguyó también como error la conclusión de que se concretaron todos los elementos de la doctrina de pago en finiquito. Así mismo, planteó que la mencionada doctrina es incompatible con el Código de Seguros, *infra*.

**II**

**A.**

La Sentencia Sumaria es un mecanismo procesal utilizado para disponer de una controversia sin tener que llevar a cabo un Juicio en su fondo. Los tribunales pueden dictar Sentencia sumariamente cuando no hay controversia de hechos materiales y meramente procede una aplicación del derecho a los hechos no controvertidos. Conforme a la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, procede dictar Sentencia

Sumaria si las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas u otra evidencia acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y material y, además, si el derecho aplicable así lo justifica.

La parte promovente de la Moción de Sentencia Sumaria viene obligada a desglosar los hechos sobre los que aduce que no existe controversia y, para cada uno, especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya. *Íd.* Igualmente, la parte que se opone a una Moción de Sentencia Sumaria tiene el deber de hacer referencia a los párrafos enumerados por la parte promovente que entiende que están en controversia y, para cada uno, detallar la evidencia admisible que sostiene su impugnación. *Íd.* Como norma general, "para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente". *Ramos Pérez v. Univisión*, 178 DPR 200, 215 (2010), citando a *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986). Si el oponente no controvierte los hechos propuestos de la forma en la que lo exige la Regla 36.3 de Procedimiento Civil, *supra*, se podrán considerar como admitidos y se dictará la Sentencia Sumaria en su contra, si procede.

Al momento de revisar una Sentencia dictada de forma sumaria, el Tribunal de Apelaciones está obligado a aplicar

los mismos criterios exigidos al foro primario por la Regla 36 de Procedimiento Civil, *supra*, lo cual incluye revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla. *Roldán Flores v. M. Cuebas*, 199 DPR 664, 679 (2018). En esa evaluación, el foro apelativo intermedio ausculta la existencia de una controversia real de hechos materiales y, de no haberlas, procede a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a los hechos incontrovertidos. *Meléndez González v. M. Cuebas*, 193 DPR 100, 117-119 (2015).

## B.

La industria de seguros es altamente regulada por implicar un asunto de alto interés público que incide sobre la economía y la sociedad. *Jiménez López v. Simed*, 180 DPR 1, 8 (2010). Por medio del contrato de seguros, una persona se obliga a indemnizar, pagar o proveerle a otra un beneficio específico o determinable al producirse un suceso incierto previsto en este. Art. 1.020 de la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como Código de Seguros de Puerto Rico, 26 LPRA sec. 102. La relación jurídica entre el asegurador y el asegurado es de naturaleza contractual y se rige concretamente por lo pactado en el contrato de seguros, que es la ley entre las partes. *Jiménez López v. Simed*, supra, pág. 10.

En el desempeño de las obligaciones pactadas, los aseguradores deben ceñirse a las normas contenidas en el

Código de Seguros y los cuerpos reglamentarios que rigen el comportamiento de una relación asegurador-asegurado. Dentro de esas normas se encuentra la prohibición de incurrir en prácticas desleales y fraudulentas en el ajuste de reclamaciones. Arts. 27.161 y 27.260 del Código de Seguros de Puerto Rico, 26 LPRA secs. 2716 y 2735; Reglamento Núm. 2080 de la Oficina del Comisionando de Seguros de 6 de abril de 1976 (Reglamento Núm. 2080). Algunas de las prácticas que se consideran desleales son: (1) hacer falsas representaciones de los hechos o de los términos de una póliza; (2) rehusar pagar una reclamación sin llevar a cabo una investigación razonable; (3) no intentar de buena fe llevar a cabo un ajuste rápido, justo y equitativo de una reclamación; (4) obligar a los asegurados a entablar pleitos para recobrar bajo los términos de una póliza porque se les denegó incorrectamente la cubierta o se les ha ofrecido una cantidad sustancialmente menor a la que podrían recobrar en un litigio, y (6) intentar transigir una reclamación por una cantidad menor a la que el asegurado razonablemente tenga derecho. Art. 27.161 del Código de Seguros de Puerto Rico, *supra*.

Asimismo, cuando un asegurado presenta una reclamación para cobrar las pérdidas cubiertas por su póliza, la entidad aseguradora debe cumplir con lo dispuesto en el Art. 27.162 del Código de Seguros, *supra*. Esta obligación consiste en la investigación, ajuste y resolución de la reclamación de forma final en los noventa (90) días luego de presentada.

Durante ese término, el asegurador debe realizar una investigación diligente que incluya, *inter alia*: (1) precisar si el evento damnificador ocurrió durante la vigencia de la póliza; (2) acotar si el asegurado reclamante tenía un interés asegurable; (3) determinar si la propiedad damnificada es aquella descrita en las declaraciones; (4) confirmar si las pérdidas reclamadas no están sujetas a exclusiones de riesgo, y (5) escrutar si el daño fue causado por negligencia de un tercero, de modo tal que el asegurador pueda subrogarse en los derechos de resarcimiento de su asegurado. *Carpets & Rugs v. Tropical Reps*, 175 DPR 615, 634 (2009).

Luego de culminado ese ejercicio, la aseguradora emite una determinación a fin de resolver la reclamación presentada. Esa determinación debe constituir una oferta razonable, en virtud de los términos de la póliza y la investigación realizada. *Com. Seg. PR v. Antilles Ins. Co.*, 145 DPR 226 (1998). Es decir, la comunicación enviada al asegurado debe incluir todas las cantidades que deban ser incluidas de acuerdo con la reclamación radicada, la investigación del asegurador y los límites de la póliza. Reglamento Núm. 2080, *supra*, pág. 3. La reclamación quedará resuelta mediante el pago total de la reclamación o la denegación escrita y fundamentada de la misma.[100] Art. 27.163

---

[100] Una reclamación también quedará resuelta **por inactividad** del reclamante, cuando el reclamante no coopere o no entregue la información necesaria para que el asegurador pueda realizar el ajuste. Art. 27.163 del Código de Seguros, 26 LPRA sec. 2716c

del Código de Seguros, 26 LPRA sec. 2716c. De proceder un pago, la determinación del asegurador le informa al asegurado que:

> [D]espués de una investigación diligente, un análisis de los hechos que dieron lugar a la pérdida, un examen de la póliza y sus exclusiones, y un estudio realizado por el ajustador de reclamaciones del asegurador, se concluye que la póliza cubre ciertos daños reclamados por el asegurado, en las cantidades incluidas en la comunicación. Después de todo, al analizar una reclamación, los aseguradores tienen una obligación de llevar a cabo un ajuste rápido, justo, equitativo y de buena fe. *Carpets & Rugs v. Tropical Reps*, supra, pág. 635.

En caso del asegurado estar en desacuerdo con la determinación de la aseguradora, entonces tiene la opción de solicitar reconsideración ante la entidad aseguradora o acudir a los foros judiciales y administrativos pertinentes para hacer valer sus derechos. Lo anterior surge del Reglamento Núm. 8386 de la Oficina del Comisionado de Seguros de 21 de agosto de 2013. Mediante este Reglamento se estableció la Regla 47-A para regular la primera solicitud de reconsideración de la determinación del asegurador. La Regla les impuso la obligación a los aseguradores de investigar, ajustar y resolver toda primera solicitud de reconsideración dentro de treinta (30) días de presentada. La solicitud debe presentarse por escrito, indicar los hechos y los asuntos pertinentes y el reclamante debe alegar tener derecho al pago, a un pago distinto al ofrecido o volver a reclamar el daño compensable. Por último, la Regla expresa claramente que nada de lo dispuesto puede entenderse

como una limitación del derecho del asegurado de acudir a cualquier foro administrativo o judicial. Por lo tanto, de considerar que la aseguradora incurrió en una práctica desleal en el proceso de ajuste de su reclamación, el asegurado tiene disponible un remedio administrativo ante la Oficina del Comisionado de Seguros.[101] Asimismo, tiene disponibles remedios judiciales, lo que pudiera incluir una acción por los daños sufridos.[102]

## C.

Con ese marco estatutario en mente, debemos considerar la figura del pago en finiquito (*accord and satisfaction*). Esta figura, proveniente del Derecho Común, fue importada a nuestro acervo jurídico mediante jurisprudencia. Constituye una de las formas para extinguir una obligación y puede utilizarse como una defensa afirmativa al responder las alegaciones de un pleito civil. Regla 6.3(b) de Procedimiento Civil, 32 LPRA Ap. V.

El *accord and satisfaction* representa un "[m]étodo corto y práctico para zanjar diferencias [y] se utiliza a menudo en la práctica". M.E. García Cárdenas, *Derecho de Obligaciones y Contratos*, 2017, pág. 243. Opera "como un método informal de resolución de controversias que se lleva

---

[101] El Art. 27.260 del Código de Seguros, 26 LPRA sec. 2735, establece que a cualquier persona que infrinja las disposiciones relacionadas a prácticas desleales y fraude podrá imponérsele una multa administrativa que no excederá de diez mil (10,000) dólares por cada violación.
[102] El asegurado pudiera reclamar daños por incumplimiento contractual. Además, en 2018 se incorporó al Código de Seguros un remedio civil a favor del asegurado por los daños sufridos a causa de haber el asegurador incurrido en una práctica desleal en el ajuste de su reclamación. Art. 27.164 del Código de Seguros, 26 LPRA sec. 2716d.

a cabo mediante el uso de un instrumento negociable [...]".
M.R. Garay Aubán, *Derecho cambiario de Estados Unidos y Puerto Rico*, Ponce, Ed. Revista de Derecho Puertorriqueño, 1999, pág. 279. Por sus semejanzas al contrato de transacción, esta figura se le ha denominado una transacción al instante: "al igual que su paralelo de mayor solemnidad la transacción, [el *accord and satisfaction*] es accesorio, consensual, bilateral y oneroso". *A. Martínez & Co. v. Long Const. Co.*, 101 DPR 830, 835 (1973). No obstante, el pago en finiquito "opera en un área de contratación rápida propia de nuestros días y es más asequible para la terminación en corto plazo de diferencias, incertidumbres y mutuas reclamaciones que el contrato de transacción". *Íd.*

Precisa el concurso de los elementos siguientes para que exista un *accord and satisfaction*: (1) Una reclamación ilíquida o sobre la cual exista controversia *bona fide*; (2) un ofrecimiento de pago por el deudor; y (3) una aceptación del ofrecimiento de pago por el acreedor.

El primer elemento para examinar es si se trata de una deuda ilíquida o, en su defecto, una deuda sobre la cual existe una controversia *bona fide* sobre su existencia.[103]

---

[103] En *City of San Juan v. St. John's Gas Co.*, 195 U.S. 510 (1904), el Tribunal Supremo de Estados Unidos reconoció la distinción entre una deuda ilíquida y una sujeta a controversia *bona fide*:

> [T]he well-established rule "that where a liquidated sum is due, the payment of a less sum in satisfaction thereof, though accepted as satisfaction, is not binding as such, for want of consideration" [...] is subject, among others, to the well-established exception that it does not apply where, at the time of the agreement, there was a dispute between the parties, the subject-matter of which dispute is embraced in the agreement to extinguish a greater by a less amount. [...] Despite the construction which we have given the

Para efectos del caso ante nos, nos concentraremos en el aspecto de la liquidez. Una deuda es ilíquida cuando es fluida e incierta la cuantía representativa del justo balance que saldaría el contrato. *A. Martínez & Co. v. Long Const. Co.*, supra, pág. 834. *A contrario sensu*, una deuda es líquida cuando el monto de lo adeudado es definitivo o puede determinarse con exactitud, ya sea del acuerdo entre las partes o mediante la aplicación de reglas definidas por ley. 1 Am.Jur. 2d (Accord & Satisfaction), Sec. 8. En tal contexto, este Tribunal expresó que una reclamación era líquida cuando se observaba que "**en cuanto a la exactitud de la cantidad reclamada** por el demandante **no existía disputa**, sino simplemente en cuanto a la obligación de pagarla". *López v. South Porto Rico Sugar Company of Porto Rico*, 62 DPR 238, 245 (1943).[104]

Referente al segundo elemento, el ofrecimiento de pago por el deudor a su acreedor tiene que estar acompañado por actos o declaraciones que claramente indiquen que el pago

---

contract, we think it is quite clear that the proof established that there was a bona fide dispute in this case. *Íd.*, pág. 522.

Por lo tanto, "**a claim may be liquidated in amount and there may still be an accord and satisfaction** by the receipt of a smaller amount by the creditor, **if the claim, itself**, as distinguished from its amount, **is disputed** and the settlement [is] made in view of the dispute [...]". (Énfasis suplido). *Laxton v. Retail Hardware Mut. Fire Ins. Co.*, 48 S.W.2d 144, 146 (Mo.App. 1932).

[104] En *López v. South Porto Rico Sugar Company of Porto Rico*, 62 DPR 238, 245 (1943), la deuda era líquida, por lo cual debía existir una controversia *bona fide* sobre la obligación de pagarla para satisfacer el primer elemento de la defensa de aceptación como finiquito. La defensa fue rechazada porque al momento de extenderse el ofrecimiento de pago "ya el Tribunal Supremo de los Estados Unidos, al denegar la expedición del auto de certiorari[,] había disipado la duda que tenía la demandada en cuanto a su obligación de pagar la cantidad reclamada por el demandante", lo cual impidió concluir que la controversia era *bona fide*. *Íd.*, pág. 246.

ofrecido es en pago total, completo y definitivo de la deuda existente entre ambos. *H.R. Elec., Inc. v. Rodríguez*, 114 DPR 236, 242 (1983).

Finalmente, el tercer elemento consiste en evaluar la aceptación del pago cursado. El *accord and satisfaction* quedará perfeccionado "con la simple retención del cheque por el acreedor que con ello expresa su consentimiento [...]". *A. Martínez & Co. v. Long Const. Co.*, supra, pág. 835. Esta retención debe estar acompañada de actos afirmativos, posteriores al recibo del cheque, que claramente indiquen la aceptación de la oferta. Por ejemplo, hemos interpretado como suficiente que el deudor utilice el cheque para su propio y permanente provecho mediante su endoso y cambio. Además, que retenga el cheque sin explicación por tiempo inusitado. *H.R. Elec., Inc. v. Rodríguez*, supra, pág. 243.

Cónsono con el principio de buena fe que permea toda actividad jurídica, el concurso de estos elementos debe ser en ausencia de opresión o indebida ventaja de parte del deudor. *A. Martínez & Co. v. Long Const. Co.*, supra, pág. 834. De esto ocurrir, "mediando circunstancias claramente indicativas para el acreedor de que el cheque remitido lo era en pago y saldo total del balance resultante de la liquidación final del contrato, están presentes todos los requisitos de este modo de extinción de las obligaciones". *Íd.*

Cabe mencionar que, posterior a su adopción jurisprudencial, la aceptación como finiquito fue codificada en la Ley Núm. 208-1995, según enmendada, conocida como Ley de Transacciones Comerciales, 19 LPRA Sec. 401 *et seq*. En lo pertinente, la ley establece lo siguiente:

> (a) Si una persona contra quien se hace una reclamación prueba que (i) ofreció de buena fe un instrumento al reclamante en pago total de la reclamación, (ii) el monto de la reclamación no había sido liquidado o estaba sujeto a una controversia bonafide, y (iii) el reclamante obtuvo el pago del instrumento, las siguientes subsecciones serán de aplicación.
> (b) [...] si la persona contra quien se establece la reclamación prueba que el instrumento o una comunicación escrita que le acompaña contiene una declaración conspicua a los efectos de que el instrumento fue ofrecido en pago total de la reclamación, la reclamación queda saldada. Sección 2-311 de la Ley de Transacciones Comerciales, 19 LPRA sec. 611.

La Ley de Transacciones Comerciales, *supra*, además de los requisitos ya discutidos, expresamente establece que el ofrecimiento debe ser de buena fe. Es decir, con "honestidad de hecho y la observancia de las normas comerciales razonables de trato justo". Sección 2-103 de la Ley de Transacciones Comerciales, 19 LPRA sec. 503. Asimismo, la legislación adiciona como requisito que el instrumento, o la comunicación escrita que le acompañe, debe contener una declaración conspicua a los efectos de que el ofrecimiento se hizo en pago total de la reclamación. La Ley de Transacciones Comerciales considera un término de una cláusula como "conspicuo" cuando "está redactado de tal forma que una persona razonable, que será afectada por el

mismo, deberá notarlo". Sección 1-201 de la Ley de Transacciones Comerciales, 19 LPRA sec. 451. Se ofrecen como ejemplos cuando se utilizan letras mayúsculas, un texto escrito en letras más grandes, en otro tipo de letra o con un color distinto.

### D.

Corresponde en este momento evaluar la interrelación entre la legislación de los seguros y la defensa de pago en finiquito. Como punto de partida, recurrimos al texto del Código de Seguros. En esta ley, la única mención expresa que se hace de la figura de pago en finiquito es en el Art. 27.166 del Código de Seguros, 26 LPRA sec. 2716f. El mencionado Artículo regula lo concerniente a pagos parciales o en adelanto de reclamaciones ante eventos catastróficos y establece que:

> (d) **La aceptación de un pago parcial o en adelanto por el asegurado reclamante no constituirá, ni podrá ser interpretado, como un pago en finiquito o renuncia a cualquier derecho o defensa** que éste pueda tener **sobre los otros asuntos de la reclamación en controversia que no estén contenidos expresamente en la declaración de oferta de pago parcial o en adelanto.**

Notamos que lo establecido en esa disposición mandata que sea inaplicable la defensa de pago en finiquito a los asuntos que no estén contenidos expresamente en la declaración de oferta. Ciertamente, un acuerdo no puede aplicar a lo que en él no se contempla. Pero lo realmente revelador de esta disposición es que no excluye la aplicabilidad del *accord and satisfaction* a las

reclamaciones de seguros, sino que aclara una situación en la cual sería erróneo utilizarla.

Por otro lado, aunque no hace mención expresa del pago en finiquito, la Carta de Derechos del Consumidor de Seguros establece que los asegurados tienen el derecho a que su asegurador les "**envíe su oferta con desglose del ajuste para su evaluación**, antes de recibir un cheque que usted no ha aceptado, o **concurrentemente con el cheque, sin que se entienda que el simple recibo del mismo significa una renuncia a sus reclamaciones**". Artículo 1.120 del Código de Seguros, 26 LPRA sec. 118. De esto se puede colegir que el simple recibo del cheque del asegurador no significa que el asegurado haya renunciado a sus reclamaciones. Empero, de estar presentes actos afirmativos, como el endoso y cambio del instrumento, nada impide que se aplique la doctrina del pago en finiquito, siempre que se cumplan la totalidad de los elementos de esta figura.[105]

En este análisis resulta inescapable remontarnos a los embates naturales que azotaron a Puerto Rico en 2017. Tras estos sucesos, sin sorpresa alguna, surgieron una gran cantidad de reclamaciones de seguros por daños a la propiedad. Más allá de las consecuencias experimentadas individualmente por los ciudadanos, estos eventos tuvieron

---

[105] Debe además considerarse lo dispuesto en la Sección 2-311 de la Ley de Transacciones Comerciales, 19 LPRA sec. 611, la cual dispone que una reclamación no queda saldada como pago en finiquito cuando el acreedor "prueba que dentro de los noventa (90) días siguientes al pago del instrumento, ofreció el repago de la cantidad de dinero especificada en el instrumento a la persona contra quien se establece la reclamación".

consecuencias directas sobre la labor legislativa. En específico, fueron punta de lanza para varios proyectos de ley dirigidos a atender la controversia que hoy tenemos ante nos.

El 9 de octubre de 2019, se radicó el Proyecto de la Cámara 2285, primer proyecto legislativo relacionado al tema que nos compete. En el mismo se adelantaba enmendar el Código de Seguros para establecer que ninguna compañía de seguros podía extinguir una obligación mediante la figura de pago en finiquito sin antes proveerle al asegurado una explicación detallada, por escrito y oral, sobre el alcance y consecuencias de recibir dicho pago. Por haber finalizado la última Sesión Ordinaria de la Decimoctava Asamblea Legislativa, la Comisión de Asuntos del Consumidor, Banca y Seguros de la Cámara de Representantes no logró considerar el Proyecto y rindió un Informe Negativo. Por otro lado, el 17 de octubre de 2019 se radicó el segundo proyecto de ley relacionado al pago en finiquito en el ámbito de los seguros. Este fue el Proyecto del Senado 1417, el cual proponía prohibir, retroactivamente, la defensa de pago en finiquito en pleitos judiciales de seguros, de manera que quedaran cobijadas las reclamaciones presentadas como consecuencia de las tormentas de 2017. Esta medida tampoco se aprobó, siendo la última incidencia legislativa su remisión a la Comisión de Reglas y Calendario del Senado el 22 de junio de 2020. Por último, actualmente se encuentra bajo estudio en la Asamblea Legislativa el Proyecto de la Cámara 153. Este

proyecto de ley, radicado el 5 de enero de 2021, es muy similar al anterior Proyecto de la Cámara 2285. Su intención es añadir como una práctica desleal en el ajuste de reclamaciones lo siguiente:

> (22) Ninguna compañía de seguros podrá extinguir una obligación mediante la figura de pago en finiquito sin antes proveerle al asegurado una explicación detallada, por escrito y oral, sobre el alcance y consecuencias de recibir dicho pago. La explicación en cuestión debe exponer claramente al asegurado que recibir el pago en cuestión constituye el pago total y definitivo de la obligación. P. de la C. 153, pág. 3.

La medida propuesta admite la aplicación del pago en finiquito a las reclamaciones de seguros. Además, para permitir el reconocimiento de la figura, propone exigir que el asegurado sea orientado sobre las consecuencias de aceptar el pago tanto de forma oral como escrita.

Tomando todo lo expuesto en consideración, debo concluir que el Código de Seguros no excluye la aplicación de la figura de pago en finiquito en las reclamaciones de seguros.

Conforme a la normativa jurídica antes expuesta, paso a resolver la controversia ante nos.

### III

Primero, corresponde determinar si el Tribunal de Apelaciones aplicó correctamente el estándar de revisión de Mociones de Sentencia Sumaria.

La causa de acción presentada por el peticionario ante el foro primario fue una por incumplimiento contractual. En específico, alegó que MAPFRE incumplió con la póliza y lo

establecido en el Código de Seguros, *supra*, respecto a la prohibición de realizar ajustes injustificados a las reclamaciones. Planteó que MAPFRE le denegó impropiamente la cubierta de las pérdidas a las que tiene derecho a recibir bajo los términos del contrato.

A raíz de ello, MAPFRE presentó una *Moción de Desestimación y/o Sentencia Sumaria* en donde solicitó la desestimación de la Demanda por ser de aplicación la defensa de pago en finiquito. Para sustentar su posición, desglosó once (11) hechos que entendía estaban incontrovertidos. A tenor con la Regla 36 de Procedimiento Civil, *supra*, para cada hecho especificó la prueba que lo apoyaba. Luego, expuso su argumentación legal y conclusión.

Por el otro lado, el peticionario presentó su *Oposición a Moción de Desestimación y/o Sentencia Sumaria*. En esta, el peticionario copió los hechos materiales que el recurrido había enumerado en su Moción de Sentencia Sumaria como incontrovertidos, sin más. No los refutó conforme establecen las reglas procesales. Luego, procedió a argumentar su posición en derecho. En alguna parte de su exposición, referenció un Informe de Ajuste procurado por este en agosto de 2018. Expresó que los daños determinados por el ajustador contratado por él difieren de los daños determinados por el ajustador contratado por MAPFRE en marzo de 2018 ($154,017.23 *vis à vis* $3,681.00). En esencia, le imputa mala fe a MAPFRE en el proceso de ajuste de la reclamación. Apoya su contención exclusivamente en esa diferencia entre

los dos (2) documentos para argumentar que MAPFRE incurrió en prácticas desleales que impiden la aplicación de la figura de pago en finiquito y requieren de la celebración de un Juicio. No refutó los siguientes hechos presentados por el recurrido, los cuales, según indicamos, estaban apoyados por prueba documental y eventualmente fueron acogidos como hechos incontrovertidos por el Tribunal de Primera Instancia:

1. La Parte Demandante está compuesta por [Á]ngel E. Feliciano Aguayo. *Véase* **¶ 4 de la Demanda.**

2. La Parte Demandante es dueña de una propiedad que ubica en Parque del Monte 2, KK14 Calle Urayoán Caguas, Puerto Rico. *Véase* **¶ 6 de la Demanda.**

3. Al 20 de septiembre de 2017, la Propiedad estaba asegurada contra el peligro de huracán bajo la póliza número 3777751609530 expedida por MAPFRE (la "Póliza"). *Véase* **Anejo A – Declaraciones**

4. De conformidad con la Póliza, se aseguraba la propiedad por el límite de $140,165.00, en estructura con deducible de $2,803.00 y por el límite de $15,000.00 en propiedad personal con deducible de $500.00. *Véase* Anejo A – Declaraciones.

5. El 20 de septiembre de 2017, la Propi[e]dad sufrió daños como consecuencia del paso del Huracán María por la isla de Puerto Rico. ***Véase* ¶10 de la Demanda.**

6. En enero de 201[8] la parte demandante realizó un aviso de pérdida a MAPFRE por los daños que sufrió la Propiedad como consecuencia del paso del Huracán María por la isla de Puerto Rico; al cual MAPFRE le asignó el número 20183267997. *Véase* ¶10 de la Demanda

7. **MAPFRE realizó una inspección de la Propiedad** el 14 de marzo de 2018. *Véase* **Anejo B – Informe de Inspección.**

8. **Luego de realizar una inspección, y una vez concluido el proceso de investigación y ajuste de la reclamación,** *Véase* Anejo C **se le notificó a la parte demandante que procedía un pago por la cantidad de $3,878.00 por concepto de estructura y se ordenó el pago de dicha cantidad mediante cheque** 1819947 el 2 de abril de 2018. *Véase* **Anejo D - Cheque.**

9. Que **dicho cheque indicaba que era en pago total y final de la reclamación por daños ocasionados por el Huracán María** ocurrido el 09/20/2017.

10. Adem[á]s se notificó el cierre a su reclamo de Contenido el 1 de abril de 2018. *Véase* Anejo E – Carta de Cierre por c[o]ntenido.

*11.* Que **dicho cheque fue recibido, aceptado y cambiado por la parte demandante, sin expresión de objeción, condición o reserva alguna.** *Véase* **Anejo F - Cheque cobrado.**[106]

El peticionario falló en presentar contradeclaraciones juradas y contradocumentos que pusieran en controversia los hechos presentados por el promovente. Las meras afirmaciones no son suficientes para derrotar una Moción de Sentencia Sumaria. La parte que se opone debe también presentar prueba para sustentar su posición y/o refutar la del promovente, so pena de que puedan darse por admitidos los hechos señalados por el promovente. No bastan generalizaciones y conclusiones de derecho. "[L]as determinaciones de hecho establecen qué fue lo que pasó, mientras que en las conclusiones de derecho se determina el significado jurídico de esos hechos conforme a determinada norma legal". *Lugo Montalvo v. Sol Melia Vacation*, 194 DPR 209, 226 (2015).

---

[106] Apéndice de la Apelación, pág. 60.

En su oposición, el peticionario se limitó a especular sobre la razón para una diferencia en los daños determinados por los ajustadores y a expresar sus conclusiones de derecho sobre la controversia. No argumentó con hechos específicos apoyados en prueba cuál fue, a su entender, el incumplimiento del recurrido con el proceso de investigación y ajuste ni cuáles fueron las pérdidas específicas que, conforme a la cubierta de la póliza, fueron omitidas o subvaloradas. Dado que las alegaciones del peticionario fueron todas conclusorias, no existe controversia material de hechos que impidiera dictar Sentencia de forma sumaria. Consecuentemente, los foros *a quo* no erraron al dar por admitidos los hechos señalados por el recurrido.

En este examen tenemos muy presente la conocida norma de que en nuestra jurisdicción la buena fe se presume por lo que, quien reclama la mala fe, debe probarla. *Citibank v. Dependable Ins. Co., Inc.*, 121 DPR 503, 519 (1988); *Cervecería Corona v. Commonwealth Ins. Co.*, 115 DPR 345, 351 (1984). También es de hondo arraigo en nuestro ordenamiento la norma de que el fraude no se presume. *McNeil Healthcare, LLC v. Municipio de Las Piedras*, 2021 TSPR 24, pág. 43. Aun cuando la revisión de la denegatoria o concesión de una Moción de Sentencia Sumaria se lleva a cabo examinando el expediente de la manera más favorable hacia la parte que se opone, y llevando a cabo todas las inferencias permisibles a su favor, la diferencia entre los daños estimados por los peritos de ambas partes es insuficiente, por sí sola, para

concluir que existe controversia real sobre hechos materiales. Los estimados fueron realizados en fechas distantes por ajustadores distintos. Además, la póliza establece límites de responsabilidad, los cuales fueron aplicados en el proceso de ajuste sin objeción del peticionario. Los autos carecen de alegaciones adecuadas y evidencia demostrativa para establecer que la aseguradora actuó de mala fe.

Inexistente una controversia real sobre los hechos materiales del caso, procedo entonces a evaluar si erraron los foros *a quo* en su aplicación del derecho a los hechos de esta controversia.

Según los hechos incontrovertidos, el peticionario presentó una reclamación ante MAPFRE. La compañía aseguradora recibió la reclamación, la investigó e inspeccionó el bien asegurado. Posterior a ello, hizo los ajustes correspondientes con arreglo a la póliza de seguros. Realizada esta labor, MAPFRE le envió al asegurado una carta. La misiva indicaba *ad verbatim* lo siguiente:

> Re: *Reclamación de daños ocasionados por el paso del Huracán Irma y/o María*
> Póliza Núm.: 3777751609530
> Reclamación Núm.: 20183267997
>
>
> Estimado Asegurado:
>
> Por este medio se le notifica que hemos concluido con el proceso de investigación y ajuste de la reclamación de referencia. Adjunto encontrará un estimado de los daños que identificó MAPFRE fueron ocasionados a su propiedad a consecuencia del huracán. Conforme a ello, MAPFRE concluyó que los daños sufridos por su propiedad ascienden a

$3,681.00. Luego de ajustar su reclamación y de aplicar el deducible correspondiente se incluye el cheque #1819947 emitido por MAPFRE a su favor y a favor de BANCO POPULAR DE PR (OFICINA CENTRAL) por la cantidad de $3,878.00.
Con el pago de la cantidad antes indicada, se resuelve su reclamación y por ende se está procediendo a cerrar la misma.

De usted entender que existen daños adicionales a los identificados por MAPFRE en el documento adjunto, o no estar de acuerdo con el ajuste, conforme establece la ley usted tiene derecho a solicitar una reconsideración del ajuste efectuado.

Su solicitud de reconsideración deberá ser por escrito, estableciendo los motivos por los cuales se debe reconsiderar nuestra decisión y de existir daños adicionales presentar evidencia documental y/o fotográfica de los mismos. Dicha solicitud de reconsideración deberá ser dirigida a la siguiente dirección:

MAPFRE
Dpto. de Reclamaciones de Propiedad
P.O. Box 70333
San Juan, Puerto Rico 00936-8333
anortiz@mapfrepr.com

De tener usted alguna duda, puede comunicarse con nosotros a su conveniencia. Apéndice de la Apelación, pág. 72.

En conjunto con la referida carta, MAPFRE anejó un cheque. No hay controversia que dicho cheque fue cobrado por el peticionario.

Ante ese cuadro fáctico, cabe preguntarse si se configuró un *accord and satisfaction*. Respondo en la afirmativa.

En primer lugar, la deuda ante nos es una ilíquida. Lo anterior, dado que el monto de la reclamación no está fijado exactamente por la cubierta de la póliza, sino que se trata de una cantidad incierta. A diferencia de, por ejemplo, los

seguros de vida o los seguros sobre determinada propiedad personal, los seguros sobre la propiedad inmueble suelen representar una cantidad ilíquida. Esto ocurre porque la cantidad de la pérdida potencialmente cubierta por el contrato de seguro de vivienda, naturalmente, no está fijada y acordada exactamente en el contrato. La oferta que circula la aseguradora tras el ajuste se trata de un **estimado razonable** de los daños que entiende están cubiertos. Esa estimación está sujeta a la impugnación del asegurado mediante una solicitud de reconsideración. Al momento de enviarse ese estimado, el asegurado no ha aceptado la cantidad como correcta, dejando activo el riesgo de una controversia relacionada a la cuantía procedente. En todo caso, la deuda se tornaría líquida cuando ambas partes se ponen de acuerdo sobre cuánto es la cantidad exacta y correcta para satisfacer la reclamación. Por tanto, el estimado circulado por la aseguradora no convierte la deuda en una líquida.

Para fines aclaratorios, traigo a colación las expresiones de este Tribunal en *Carpets & Rugs v. Tropical Reps*, supra. Aunque en el contexto de una controversia evidenciaria,[107] en el mencionado caso se expresó que la

---

[107] La discusión en *Carpets & Rugs v. Tropical Reps*, 175 DPR 615, 635 (2009) giró en torno a la Regla 22(b) de las Reglas de Evidencia de 1979, la cual disponía: "(1) Pleitos civiles: no será admisible para probar responsabilidad, o para probar que la reclamación o parte de ésta carece de validez, evidencia de: (a) que una persona ha provisto, ofrecido o prometido proveer dinero o cualquier otra cosa de valor para transigir una reclamación; (b) que una persona ha aceptado, ofrecido o prometido aceptar, dinero o cualquier otra cosa de valor para transigir una reclamación, o (c) conducta realizada o manifestaciones efectuadas en el curso de la negociación de la transacción".

determinación de la aseguradora tras la investigación y ajuste correspondiente "constituye la postura institucional del asegurador frente a la reclamación de su asegurado" y, por ende, "en dicho documento no existen concesiones del asegurador hacia su asegurado". *Íd.*, pág. 635. De manera que, al estar ausentes concesiones recíprocas y una controversia *bona fide* entre las partes cuando se envió el ajuste de la reclamación, se interpretó que no cabía hablar de conversaciones realizadas para alcanzar un contrato de transacción. Además, se expresó en *dictum* que:

> Esto no quiere decir que, con ese documento como base de negociación, asegurador y asegurado puedan considerar llegar a un contrato de transacción de la reclamación. Las posibilidades de transacción entre asegurador y asegurado sólo estarán limitadas por lo que en su día el asegurador informó como procedente en su comunicación o postura inicial. Por lo tanto, el asegurado podría renunciar a ciertas partidas a cambio de que el asegurador acepte otras que inicialmente estimó improcedentes o se modifiquen sumas de las ofrecidas originalmente. Lo que de forma alguna es permisible es que un asegurador, ante un reclamo judicial de su asegurado, deniegue partidas que en su ajuste inicial entendió procedentes, en ausencia de fraude u otras circunstancias extraordinarias que lo ameriten.

Esa evaluación se cimentó en el contrato de transacción, figura con elementos diferentes a la del pago en finiquito.[108] Este Tribunal concluyó que para que esas comunicaciones fueran inadmisibles en evidencia, tenía "que haber una

---

[108] A tenor con el derogado Art. 1709 del Código Civil, 31 LPRA ant. sec. 4821, los elementos constitutivos del contrato de transacción son: "(1) una **relación jurídica** incierta y **litigiosa**; (2) **la intención de los contratantes de componer el litigio** y sustituir la relación dudosa por otra cierta e incontestable, y (3) las recíprocas concesiones de las partes". (Énfasis suplido). *Mun. San Juan v. Prof. Research*, 171 DPR 219, 239 (2007).

controversia entre las partes al momento en que se realiz[ó] la oferta o comunicación con miras al contrato de transacción". *Carpets & Rugs v. Tropical Reps*, supra, pág. 631. Aun cuando esas expresiones no constituyen precedente vinculante, debo subrayar que la figura de pago en finiquito no se limita a situaciones en las que las partes están envueltas en una controversia *bona fide*, sino que también aplica cuando la cantidad de la deuda es ilíquida. Asumiendo *in arguendo*, que en el preciso momento en que la aseguradora le envía el ajuste de la reclamación al asegurado todavía no existe una controversia *bona fide* entre las partes, como quiera la deuda sigue siendo ilíquida. El hecho de que la determinación de la aseguradora represente la posición institucional sobre el monto de la reclamación, de ninguna manera significa que la reclamación se ha tornado en líquida. Lo expresado en *Carpets & Rugs v. Tropical Reps*, supra, lo único que sugiere es que en el proceso de negociación que pudiera suscitarse a causa del asegurado estar en desacuerdo con el estimado brindado, la aseguradora generalmente está impedida de retractarse del estimado inicial e intentar ofrecer menos de eso para transigir la reclamación. La reclamación continúa siendo ilíquida e incierta hasta que las partes acuerden fijar su valor.

En segundo lugar, atañe corroborar la existencia de actos o declaraciones claras de que el ofrecimiento extendido era un pago total, completo y definitivo de la deuda. Según dispone la Ley de Transacciones Comerciales,

*supra*, para reconocer la defensa de pago en finiquito la declaración debía surgir conspicuamente del instrumento o de la carta que le acompañó.

La carta recibida por el peticionario indicaba que estaba relacionada a una reclamación de daños ocasionados por el paso del Huracán Irma y/o María. Esta contenía los números de póliza y reclamación. También señalaba que, con el pago del estimado remitido, se resolvía la reclamación y se procedería a cerrar la misma. Asimismo, informó al asegurado su derecho de solicitar reconsideración y proporcionó varios métodos de comunicación para que el asegurado se contactara a su conveniencia en caso de tener alguna duda. Además de estas declaraciones, resaltamos las contenidas en el instrumento negociable. En el anverso del instrumento se hizo constar en la sección titulada "En PAGO DE", lo siguiente en letras mayúsculas: "EN PAGO TOTAL Y FINAL DE LA RECLAMACION POR HURACAN MARIA OCURRIDA EL DIA 9/20/2017". Apéndice de la Apelación, pág. 75. Por su parte, al dorso se hizo constar debajo de la sección de la firma lo siguiente: "El endoso de este cheque constituye el pago total y definitivo de toda obligación, reclamación o cuenta comprendida en el concepto indicado al anverso". *Íd.*, pág. 77.

El cúmulo de la prueba documental revela que el ofrecimiento fue acompañado de declaraciones indicativas de que el pago se ofreció en saldo total y definitivo de la obligación. Las declaraciones contenidas en la carta y el

cheque son conspicuas, pues están redactadas de forma tal que una persona razonable que será afectada por estas las notaría. Por tanto, se cumplió el segundo elemento de la defensa de pago en finiquito.

En tercer lugar, corresponde evaluar si el peticionario aceptó el ofrecimiento de pago de MAPFRE. En el caso ante nos el peticionario realizó actos afirmativos posteriores al recibo del cheque que indican la aceptación de la oferta. Esto, pues utilizó el cheque para su propio y permanente provecho al endosarlo y cambiarlo. Soy del criterio que la aceptación fue hecha con claro entendimiento de que el cambio del cheque tenía las consecuencias advertidas en la carta y en el instrumento negociable. Sería un insulto para la sociedad puertorriqueña que subestimáramos su inteligencia al partir de la premisa de que no leen los documentos que reciben o que no entenderían el contenido de una carta comprensible por una persona promedio. Una persona común y corriente que estuviera en desacuerdo con un pago enviado en saldo de una deuda, como mínimo, le expresaría su desconformidad al acreedor. Al mismo tiempo, una persona razonable que sospechara que su deudor-asegurador incursionó en una práctica desleal, no aceptaría y endosaría un cheque que expresamente indica que es "EN PAGO TOTAL Y FINAL" de su reclamación. En vez, acudiría a los foros pertinentes para repudiar esa conducta. Como indicamos, los incumplimientos con los preceptos del Código de Seguros, *supra*, pueden traerse a la atención de la Oficina del Comisionado de

Seguros con la posibilidad de la imposición de penalidades administrativas. Asimismo, la persona pudiera reclamar judicialmente los daños sufridos a consecuencia de los actos de la aseguradora. Lo que es improcedente es que el asegurado acepte y cobre, sin objeción alguna, un cheque ofrecido como saldo de la reclamación bajo la póliza y luego pretenda cobrar una cantidad mayor por concepto de daños por incumplimiento contractual.[109] Del expediente se desprende que, tras recibir el cheque, el peticionario procedió a endosarlo y cambiarlo en abril de 2018. Su insatisfacción con el ajuste realizado fue comunicada por primera vez en septiembre de 2018, alrededor de cinco (5) meses después del depósito.[110] Nuestros precedentes reconocen que el "acreedor, al hacérsele el ofrecimiento de pago sujeto a la condición de que al aceptarlo se entenderá en saldo de su reclamación, **tiene el deber de devolver al deudor la cantidad ofrecida,**

---

[109] En aquellos casos en los que no existe controversia sobre uno o varios aspectos de la reclamación, el asegurador tiene el deber de hacer el pago correspondiente sobre esas partidas, independientemente de que exista una controversia en cuanto a otros aspectos de la reclamación. Reglamento Núm. 2080 de la Oficina del Comisionando de Seguros de 6 de abril de 1976, pág. 6. El Artículo 27.166. del Código de Seguros incluso faculta a la Oficina del Comisionado de Seguros para que, ante un estado de emergencia decretado por el Gobernador, pueda ordenar a los aseguradores de propiedad a emitir pagos parciales o en adelantos al asegurado o reclamante, en cuanto a una o más partidas de las cuales no exista controversia. No obstante, esta normativa es inaplicable al caso ante nos pues el peticionario aceptó como saldo de la obligación el pago de los tres mil ochocientos setenta y ocho dólares ($3,878.00) por todos los ítems señalados en el estimado. No surge que haya objetado o expresado reserva sobre ninguna de las partidas previo a endosar el pago enviado por MAPFRE.

[110] A raíz de estos hechos, tampoco le aprovecha al peticionario lo dispuesto en la Sección 2-311 de la Ley de Transacciones Comerciales, *supra*, en cuanto a que la deuda no queda saldada como pago en finiquito si el acreedor prueba que ofreció el repago del dinero dentro del término de noventa (90) días. El peticionario no alegó que hubiera ofrecido el repago del dinero enviado antes, o incluso después, de expirado el término.

**si no está conforme con dicha condición**". (Énfasis suplido).
*H.R. Elec., Inc. v. Rodríguez*, supra, pág. 240. Por ello, el peticionario debió devolver el cheque y comunicar su desacuerdo si no deseaba finiquitar la deuda. Cuando el peticionario aceptó la oferta, renunció a su derecho de reclamar una cantidad mayor a la estimada por la aseguradora.

Por último, con relación a la exigencia de que el deudor debe actuar de buena fe y sin ejercer opresión o indebida ventaja, de los autos se desprende que el peticionario fue partícipe del proceso de inspección de la propiedad y firmó el Informe de Inspección emitido por el ajustador contratado por MAPFRE. Además, con la oferta de pago extendida por la aseguradora, este recibió una carta explicativa, un cheque y un desglose de los daños determinados por el ajustador que incluía el cálculo del ajuste empleado para alcanzar la cantidad finalmente ofrecida. El peticionario no solicitó reconsideración al ajuste realizado. Tal como señalamos, el peticionario no adujo hechos específicos que indiquen la presencia de mala fe o de opresión o indebida ventaja de parte de la aseguradora en este proceso.

Bajo los hechos particulares de este caso, no cabe más que concluir que el foro *a quo* no incidió al resolver que el foro primario tenía ante sí todos los elementos para configurar la doctrina de pago en finiquito y culminar el caso mediante una Sentencia Sumaria.

Corresponde a la Asamblea Legislativa concertar si existen razones de política pública para alterar el estado

de derecho. En tanto eso ocurra, la defensa de pago en finiquito deberá aplicarse a las reclamaciones de seguros de la manera aquí detallada.

## IV

Por los argumentos antes expresados, respetuosamente disiento de la Opinión Mayoritaria en la controversia de epígrafe. Lo que procedía resolver en este caso era confirmar la Sentencia emitida por el Tribunal de Apelaciones.


Mildred G. Pabón Charneco
Jueza Asociada